BOGGS, J., delivered the opinion of the court in which ROGERS, J., joined. KEITH, J. (pp. 638-68), delivered a separate dissenting opinion.
OPINION
BOGGS, Circuit Judge.
In 2014, Ohio enacted Senate Bills 205 and 216. Among other changes to Ohio election law, they (1) required county boards of elections to reject the ballots of absentee voters and provisional voters whose identification envelopes or affirmation forms, respectively, contain an address or birthdate that does not perfectly match voting records; (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and provisional voters to present valid identification, from ten to seven; and (3) limited the ways in which poll workers can assist in-person voters. The district court held, that all three provisions impose an undue burden on the right to vote and disparately impact minority voters.
We affirm the plaintiffs’ undue-burden claim only as it relates to the requirement imposed by Senate Bill 205 that in-person and mail-in absentee voters complete the address and birthdate fields on the identification envelope with technical precision. We reverse the district court’s finding that the other provisions create an undue burden. We also reverse the district court’s finding that the provisions disparately impact minority voters. We affirm the district court’s other holdings.
I. Background
Ohioans need not queue on Election Day to exercise the right to vote. The State accepts absentee ballots by mail and, on designated early-voting days, in person. Ohio Rev. Code §§ 3509.01(B), 3509.05(A). A voter who declares that he or she is registered but whose name does not appear on a precinct’s list of eligible voters can cast an in-person provisional ballot on either an early-voting day or Election Day. Id. § 3505.181(A)(1), (B)(2).
*619 In 2014, the Ohio General Assembly enacted Senate Bills 205 (SB 205) and 216 (SB 216), amending state election provisions that govern absentee and provisional voting. The laws have been in effect since early June 2014.
A. SB 205
Any eligible voter can apply for an absentee ballot. Ohio Rev. Code § 3509.03. Completing the application involves providing a name, signature, registration address, date of birth, and a form of identification. Id. § 3509.03(A)-(E). Acceptable identification includes: a driver’s license number; the last four digits of a Social Security number; or a copy of a valid photo ID, valid military ID, current utility bill, bank statement, government check, paycheck, or other government document (excluding a registration noticé) showing the voter’s name and address. Id. § 3509.03(E). The same are acceptable forms of identification when casting an absentee ballot. Id. § 3509.05(A). Applicants can request and receive an absentee ballot through the mail by providing a mailing address. Id. § 3509.03(1).
When voting, mail-in and some in-person absentee voters must complete an “identification envelope” along with their ballots.[1] The identification envelope contains fields for the voter’s name, signature, voting residence, and birthdate. The county boards of elections may preprint the voter’s name and address on the identification envelopes of mail-in voters. Id. § 3509.04(B).- The Secretary of State’s 2015 election manual “instruct[s]” the boards to do so in order to “eliminate any chance that a voter’s absentee ballot may be rejected for the sole reason” that the voter failed to complete those fields. Before SB 205 went into effect, absentee ballots could be rejected if the identification envelope “accompanying an absent voter’s ballot or absent voter’s presidential ballot [was] insufficient,” if the signatures “d[id] not correspond with the person’s registration signature,” or if the voter failed to provide identification. Ohio Rev. Code § 3509.07 (2013). In 2010, the Secretary circulated a directive to the county boards of elections stating that the identification envelope must include a proper voter name ahd signature for the corresponding ballot to be counted.
SB 205 added two fields to that list, it specifies that an identification envelope is “incomplete” without accurately filled birthdate[2] and address fields. Ohio Rev. Code § 3509.06(D)(3). An “incomplete” identification envelope results in the ballot’s rejection unless the voter “providets] the necessary information to the board of elections in writing and on a form prescribed by the secretary of state.” Id. § 3509.06(D)(3)(b).
SB 205 made two other changes to Ohio election law that are at issue. When an absentee ballot contains an error, the board of elections gives the voter notice of the additional information required for the ballot to be counted. SB 205 reduced the window for voters to submit corrections from the ten days after Election Day to the seven days after Election Day. See ibid. In addition, SB 205 prevents election officials from providing “assistance” to vot *620 ers with the exceptions ■ of - voters who “[d]eclare[ ]” that they are “unable to mark” their ballot due to “blindness, disability, or illiteracy.” Id. § 3505.24.
B. SB 216
Provisional voters must complete a “provisional ballot affirmation” form. Ohio Rev. Code § 3505.182. Before the implementation of SB 216, a provisional ballot was counted if the voter presented valid identification [3] and the affirmation form included the voter’s name, signature, and a statement of eligibility. Ohio Rev. Code § 3505.183(B)(1) (2013). The back of the form contained a separate registration application. Provisional voters whose ballots were rejected for failure to register but who completed the application became registered for the next election.
SB 216 added birthdate[4] and address to .the list of affirmation-form fields that provisional voters must accurately complete. Ohio Rev. Code § 3505.183(B)(1)(a). The affirmation form now doubles as a registration application, applicable to provisional voters whose ballots are rejected for failure to register. Id. § 3505.182(F). The bill also added the word “printed” before “name” in the list of affirmation-form requirements. Compare id. § 3505.183(B)(1)(a), with Ohio Rev. Code § 3505.183(B)(1)(a) (2013). This appears to have clarified, rather than modified, existing law. Between the 2008, 2010, and 2012 general elections, most counties rejected provisional ballots for failure to include a “printed” name. Furthermore, a 2012 directive from the Secretary instructed elections boards to, reject provisional ballots whose affirmation statements lacked “the voter’s printed name.”
A provisional voter without valid identification may return to the board of elections to cure an otherwise complete ballot by providing a driver’s license number, state identification card number, the last four digits of the individual’s Social Security number, a photo or military ID, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document (excluding a registration notice) showing the voter’s name and address. Ohio Rev. Code § 3505.181(B)(7)(a). SB 216 reduced the period for doing so from the ten days after Election Day to the seven days after Election Day. Compare Ohio Rev. Code § 3505.181(B)(8) (2013), with Ohio Rev. Code § 3505.181(B)(7).
C, Procedural History
In 2006, the Northeast Ohio Coalition for the Homeless (NEOCH) and the Service Employees International Union sued the Secretary to enjoin the enforcement of voter-identification and provisional-ballot laws.[5] Although perhaps rich source material for a prickly civil-procedure hypothetical, the case’s many twists and turns are unnecessary to chronicle here. Suffice it to say, litigation was still proceeding in 2010 when the parties entered a consent decree.
Ohio’s eighty-eight counties have four-person boards responsible for administrating local elections. The 2010 decree required the Secretary to inform elections *621 boards to count the provisional ballots of registered voters whose affirmation forms included an accurate name, verified signature, and the last four digits of the voter’s Social Security number. It also listed grounds on which provisional ballots' could not be rejected, including failure to' “provide a date of birth” or “address ... tied to a house, apartment or other dwelling [if] the voter indicated that he or she resides at a non-building location.”[6] The Secretary was required to give the court notice of changes to the law that would “supersede” the decree.
" The decree was in effect for the 2010 and 2012 elections. Although it was originally set to expire on June 30, 2013, the court, on the plaintiffs’ motion, extended it through the' end of 2016. In September 2014, the Secretary informed the court that SB 216’s rejection requirement for imperfect birthdate and address fields, and the three-day reduction in the cure-period, “automatically amended” the decree.
The plaintiffs moved for leave to file a supplemental complaint. See Fed. R. Civ. P. 15(d). They petitioned the court to permanently enjoin the Secretary from implementing portions of SB 205 and SB 216. The.defendants opposed. In August 2015, the court granted the motion because SB 216 “ero[ded]” the consent decree’s protections and because both SB 205 and SB 216 related to the original complaint, which challenged Ohio’s voter-identification requirements more generally.
The supplemental complaint asserts ten counts: a viewpoint-discrimination claim under the First and Fourteenth Amendments; claims under the Fourteenth Amendment’s Due Process Clause of a fundamentally unfair voting system and violation of procedural due process; claims under the Fourteenth Amendment’s Equal Protection Clause of an undue burden, lack of uniform standards, and arbitrary and disparate treatment; a claim of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments; and literacy-test, immaterial-error, and vote-denial claims under the Voting Rights Act (VRA).
The court presided over a bench trial in March 2016, Oyer the course of twelve days, it heard the testimony of more than twenty board of elections officials from different counties, two members of the Ohio General Assembly, the Assistant Secretary of State (who also serves as “head of elections”), and two members of the Ohio Association of Election Officials (OAEO), which includes members of the elections boards of every Ohio county and has equal representation from the two major parties. In addition, the record includes declarations of absentee and provisional voters whose ballots were rejected for birthdate and address errors. Several, for example, wrote the current date instead of their birthdates. One transposed the location of the digits indicating the month and day of his birth despite specific language on the form to the contrary because he grew up in a country that follows the date sequence used elsewhere in the world.
The court was also presented with opinion testimony from Dr. Jeffrey Timberlake for the plaintiffs, and Drs. Nolan McCarty and M.V. Hood, III, for the defendants. Because Ohio does not record the race or *622 ethnicity' of its voters, Timberlake used county-level data to make inferences about the relationship between voter race and the use or rejection of absentee and provisional ballots. He examined data from the 2008, 2010, 2012, and 2014 general elections.
Timberlake divided counties into “high minority” and “low minority” groups, and performed a regression assessing the correlation between a county’s percent minority and absentee and provisional ballot use and rejection. Two of his models controlled for urbanicity, and the age, education, and income of the white population. In those models, Timberlake observed “some evidence, though not very strong evidence, that absentee ballots are used' moré heavily by voters in high-minority counties.” He found “much stronger” evidence of higher rates of absentee-ballot rejection among African-American voters. All four elections showed higher use and rejection rates of provisional ballots in higher-minority counties, even when controlling for urbanicity and the three white-population characteristics.
The district court’s opinion gave “great weight” to Timberlake’s conclusions. It found that the defense expert witnesses did not refute Timberlake’s report. The court next considered nine nonexhaustive factors from Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), “that might be probative” of a violation of Section 2 of the VRA. Id. at 36, 106 S.Ct. 2752; id. at 36-37, 106 S.Ct. 2752. In particular, the court concluded that the evidence on the record did not support Ohio’s justifications for enacting SB 205 and SB 216.
Ultimately, the court entered judgment for the plaintiffs on their undue-burden and vote-denial claims, and for the defendants on all other counts. It permanently enjoined the enforcement of the portions of SB 205 and SB 216 that: require boards to reject the ballots of absentee and provisional voters who do not accurately complete the address and birthdate fields; reduce the cure period to seven days; prohibit most forms of poll-worker assistance; and require provisional voters to print their names on the affirmation form.
Ohio appeals the entry of judgment for the plaintiffs on the undue-burden and vote-denial claims. Additionally, it contends that the court improperly approved the supplemental complaint, that the plaintiffs should have been precluded from bringing their challenges, and that they lack standing. The plaintiffs cross-appeal the entry of judgment for Ohio on the uniform-standards, literacy-test, due-process, intentional-discrimination, and immaterial-error claims.
II. Claim Preclusion and Standing
Ohio argues that all three plaintiffs, and the Ohio Democratic Party (ODP) at the very least, are bound by the district court’s decision in Ohio Org. Collaborative v. Husted, No. 2:15-cv-1802, — F.Supp.3d —, 2016 WL 3248030 (S.D. Ohio May 24, 2016). If claim preclusion prevents ODP from proceeding, Ohio asserts, we should next consider its argument that the remaining plaintiffs, NEOCH, and the Columbus Coalition for the Homeless (CCH), lack standing. That one-two punch is too clever by half. Even if ODP were bound by Ohio Org. Collaborative (an issue on which we need not opine),[7] NEOCH and CCH *623 are not. And they have standing to bring suit.
For the first time on appeal, Ohio contends that NEOCH and CCH are precluded from bringing their claims because of a decision in a suit in which ODP was a party that was issued two weeks before the district-court judgment in this case. Even assuming'that Ohio did not waive this argument by failing to raise it before the district court, see Mun. Resale Serv. Customers v. FERC, 43 F.3d 1046, 1052 n.4 (6th Cir. 1995), it is without merit. “The general rule” of claim preclusion “provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound ... ‘as to every matter which was offered and received to sustain or defeat the claim or demand.’ ” Commissioner v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (quoting Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1876)). “[I]n certain limited circumstances,” a nonparty is “adequately represented by someone with the same interests who is a party.” Martin v. Wilks, 490 U.S. 755, 762 n.2, 109 S.Ct. 2180,104 L.Ed.2d 835 (1989). However, “to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented” would violate due process. Richards v. Jefferson County, 517 U.S. 793, 794, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) (citing Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)).
An essential element of adequate representation is that “[t]he interests of the nonparty and her representative are aligned.” Amos v. PPG Indus., Inc., 699 F.3d 448, 452 (6th Cir. 2012) (quoting Taylor v. Sturgell, 553 U.S. 880, 900, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008)). Citing Amos, Ohio suggests that the “aligned interests” of ODP ■ and the other plaintiffs “are shown by the fact that they co-litigated this case with joint pleadings.” First Br. 58. The lax approach to nonparty preclusion implied by that reasoning would unmoor the requirement of “adequacy” from the anchor of “representation.” “Representative capacity must be established ... by private or public appointment”— not by the assertions of a “self-appointed volunteer,” and certainly not by acting as co-parties in a later suit. 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4454 (2d ed. 2002). ODP did not represent NEOCH and CCH in Ohio Org. Collaborative.
Further, mere overlapping interest will not work to preclude a nonparty from litigating a claim that a putative representative tried earlier. See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 193 F.3d 415, 424 (6th Cir. 1999) (en banc) (rejecting claim of “virtual representation” when nonparty and supposed representative lacked “legal relationship”). Nor does Ohio point to any indication that “special procedures” were put in place to protect the interests of NEOCH and CCH in Ohio Org. Collaborative. Amos, 699 F.3d at 452. NEOCH and CCH are therefore not bound in this case by an earlier judgment against ODP.
Whether a party has standing is a legal question that appellate courts review de novo. Shearson v. Holder, 725 F.3d 588, 592 (6th Cir. 2013). When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. Dep’t of Commerce v. U.S. House of Representatives, 525 U.S. 316, 330, 119 S.Ct. 765, 142 *624 L.Ed.2d 797 (1999). Because NEOCH has organizational standing, we do not reach Ohio’s other arguments regarding NEOCH’s and CCH’s standing to bring suit,
To establish standing, a plaintiff must show a concrete and particularized injury that is actual or imminent, a causal connection between the injury and the conduct complained of, and likelihood that a favorable decision will redress the injury. H.D.V.-Greektown, LLC v. City of Detroit, 568 F.3d 609, 616 (6th Cir. 2009). In addition to suing on behalf of its members, an entity may sue “on its own behalf because it has suffered a palpable injury as a result of the defendants’ actions.” MX Grp., Inc. v. City of Covington, 293'F.3d 326, 332-33 (6th Cir. 2002).
Ohio points to our recent decision in Fair Elections Ohio v. Husted, 770 F.3d 456 (6th Cir. 2014), and argues that NEOCH and CCH have suffered no injury. In that case, we held that an organization that had conducted voter outreach lacked standing to challenge absentee-ballot procedures permitting hospitalized voters to obtain absentee ballots later than jailed voters. Id at 459. The bases offered to support its injury claim — instructing election volunteers who were already being trained in current absentee-voting procedures and speculation that the law compelled the group to divert resources — were insufficient. Id. at 459-60.
Unlike the plaintiff organization in Fair Elections that challenged then-existing voting law, NEOCH takes issue with newly enacted provisions. That distinction is not just academic. Whereas the Fair Election plaintiff merely exhausted “efforts and expense [in] advis[ing] others how to comport with” existing law, id. at 460, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of SB 205 and SB 216. In the past, NEOCH focused on educating and assisting the homeless with mail-in voting. Given the changes ushered in by SB 205 and SB 216, NEOCH determined that its resources are better spent assisting the homeless in participating in early in-person voting. To .that end, it plans to redirect its focus for the 2016 general election by encouraging early in-person voting and driving homeless voters to the polls. It reports that this will require more volunteers, time, and expenditures. That is not simply the “effort and expense” associated with advising voters how to “comport” with the law, ibid, but an overhaul of the get-opt-the-vote strategy of an organization that uses its limited resources helping homeless voters cast ballots. Their injury is imminent, as well as concrete and particularized,
Standing must exist as to each claim, however, and cannot be “dispensed in gross.” Lewis v. Casey, 518 U.S. 343, 358 n.4, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). But the record demonstrates that NEOCH has standing for its VRA claims as well. The injury suffered by NEOCH, as noted above, is directly related to SB 205 and SB 216’s alleged impact on the opportunity to vote of the African-American community. Because their allegations indicate that the burden would cause them to change significantly their expenditures and operation and a favorable decision would redress that injury, NEOCH has organizational standing here as well. Finally, with regard to the cause of action, the VRA permits suit by the Attorney General or aggrieved voters, see Allen v. State Bd. of Elections, 393 U.S. 544, 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), but the Supreme Court has permitted organizations to bring suit in VRA claims, see Ala. Legislative Black Caucus v. Alabama, — U.1S. —, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015).
*625 III. Supplemental Pleadings
The district court did not abuse its discretion by granting the plaintiffs’ motion to file a supplemental complaint. A district court may “permit a party to serve a supplemental pleading setting out any transaction, occurrence; or event that happened after the date of the pleading to be supplemented.” Fed. R. Civ. P. 15(d). Rule 15(d) aims “to give the court broad discretion in allowing a supplemental pleading.” Fed. R.. Civ. P. 15(d) advisory committee’s note to 1963 amendment.
We review for abuse of discretion. See Spies v. Voinovich, 48 Fed.Appx. 520, 527 (6th Cir. 2002). A district court abuses its discretion by relying on an incorrect legal standard, misapplying the correct legal standard, or judging the outcome based on clearly erroneous factual findings. Paterek v. Village of Armada, 801 F.3d 630, 643 (6th Cir. 2015).
Here, the court found that the original and supplemental complaints were sufficiently linked because SB 216 superseded the consent decree’s protections and because both provisions allegedly imposed burdens that would impede voting in similar ways as the voter-identification provisions originally challenged. “In essence,” the court found, “the ‘focal points’ of both complaints are the same: ensuring all ballots, but particularly provisional and absentee ballots, ... are not unfairly excluded and left uncounted due to illegal voter identification rules.”
In so concluding, the court carefully applied the correct legal standard and did not make clearly erroneous factual findings. The supplemental complaint revolved around new election laws that affected the terms of a longstanding consent decree that resolved an. even lengthier, dispute. So, Defendants’ reliance on Leisure Caviar v. U.S. Fish and Wildlife Service, 616 F.3d 612, 616 (6th Cir.2010), which addressed the issue of newly discoyered evidence after entry of judgment, is misplaced. See First Br. 56. The district court did not clearly err when it found that the plaintiffs’ primary grievance with both sets of provisions was that methods of voter identification caused elections boards to disproportionately reject homeless voters’ absentee and provisional ballots. The interest of judicial economy, although not necessarily enough in and of itself, also militates in favor of allowing supplemental pleadings. When a dispute is complicated and protracted, and a new complaint the likely alternative, allowing supplemental pleadings before a court already up to speed is often themost efficient course.
IV. Voting Rights Act Claims
All three VRA claims are contested on appeal. Ohio appeals the judgment bn the vote-denial claim. The plaintiffs appeal the judgment on the literacy-test and materiality claims.
A. Vote Denial or Abridgment
1. Legal Framework
We review the district court’s legal conclusions de novo and factual findings for clear error. Lindstrom v. A-C Prod. Liab. Tr., 424 F.3d 488, 492 (6th Cir. 2005). “Under the clear-error standard, we abide by the court’s findings of fact unless the record ‘le[aves] [us] with the definite and firm conviction that a mistake has been committed.’ ” United States v. Yancy, 725 F.3d 596, 598 (6th Cir. 2013) (alterations in original) (quoting United States v. Gardner, 649 F.3d 437, 442 (6th Cir. 2011)).[8]
*626 In City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980), the Supreme Court held that racially neutral state action did not fall within the ambit of VRA Section 2. Congress countered by amending Section 2. That response “ma[d]e clear” to the Court “that a violation [of Section 2] could be proved by showing discriminatory effect alone.” Gingles, 478 U.S. at 35, 106 S.Ct. 2752. Section 2 now reads:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
52 U.S.C. § 10301 (Supp. II Vol. Ill 2015). The statute operates as a “permanent, nationwide ban,” Shelby County v. Holder, — U.S. —, 133 S.Ct. 2612, 2631, 186 L.Ed.2d 651 (2013), on “even the most subtle forms of discrimination,” Chisom v. Roemer, 501 U.S. 380, 406, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting).
“The essence of a [Section] 2 claim” is the assertion that a challenged provision “interacts with social and historical conditions” to cause an inequality of opportunity for racial minority voters. Gingles, 478 U.S. at 47, 106 S.Ct. 2752. Evaluating that allegation “requires ‘an intensely local appraisal of the design and impact’ of the contested electoral mechanisms.” Id. at 79, 106 S.Ct. 2752 (quoting Rogers v. Lodge, 458 U.S. 613, 622, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982)). Section 2 claims involve either vote denial or vote dilution. Examining a vote-dilution claim in angles, the Supreme Court embraced nine nonexhaustive factors as relevant in assessing “the totality of circumstances” for establishing a Section 2 violation. Because the Court has yet to consider a Section 2 vote-denial claim after angles, the standard for such adjudication is unsettled.
In Ohio State Conference of the NAACP v. Husted, 768 F.3d 524 (6th Cir. 2014), we stated the analytical framework for Section 2 vote-denial claims as a two-part test: (1) “[T]he challenged ‘standard, practice, or procedure’ must impose a discriminatory burden on members of a protected class, meaning that members of the protected class ‘have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,’ ” and *627 (2) “that burden must in part be caused by or linked to ‘social and historical conditions’ that have or currently produce discrimination against- members of the protected class.” Id. at 554 (quoting 52 U.S.C. § 10301 (Supp. II Vol. Ill 2015) and Gingles, 478 U.S. at 47, 106 S.Ct. 2752). The Ohio State Conference panel affirmed an order preliminarily enjoining Ohio from reducing early in-person voting for the 2014 general election. The Supreme Court stayed that order. Husted v. Ohio State Conference of NAACP, — U.S. —, 135 S.Ct. 42, 189 L.Ed.2d 894 (2014). Because the injunction applied only to the upcoming election, the panel vacated its opinion — including its articulation of the Section 2 vote-denial test. Ohio State Conference of the NAACP v. Husted, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). On remand to the district court, the parties reached a settlement.
Two circuits have since adopted the Ohio State Conference test. See Veasey v. Abbott, 830 F.3d. 216, 243-45, No. 14-41127, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016) (en banc); League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014). The district court used it in this case, and a recent Sixth Circuit panel found it “helpful” in determining a Section 2 vote-denial claim. Ohio Democratic Party v. Husted, 834 F.3d 620, 637-38, 2016 WL 4437605, at *13 (6th Cir. Aug. 23, 2016) (evaluating a vote-denial claim using the Ohio State Conference framework, with additional clarification).
Ohio argues that the two-part test goes awry in two ways. Whether the district court did in fact mischaracterize the test is irrelevant, however. At the very least, a successful Section 2 claim requires the plaintiffs to prove disparate impact. The plaintiffs failed to prove that SB 205 and SB ■ 216 have a disparate impact on African-American voters. Therefore, analysis of any test beyond disparate impact is unnecessary.
2. SB 205 and SB 216
The district court found that “Timber-lake’s data on disparities in provisional and absentee ballot usage and rejection rates reveal that higher minority population share is correlated to higher rates of absentee ballot rejection and provisional ballot usage and rejection.” Based on that analysis, it concluded that SB 205 and SB 216 make “African-American voters ... more likely than white voters to have their absentee or provisional ballots rejected.” The record would indicate otherwise.
For starters, Timberlake’s regression analysis simply does not support the conclusion that SB 205’s address and birth-date perfection requirement, or its limitation on poll-worker assistance, disparately impact minority voters. When controlling for urbanicity and the age, income, and education of the white population, Timber-lake found that for every additional one percent minority in a county, use of absentee ballots increased by a small amount in the 2008 and 2010 general elections' — 134.2 and 195.2, respectively, for every 100,000 voting-age residents — but decreased by 99.5' and 96.6 ballots in the 2012 and 2014 general elections.[9] He therefore found that the evidence to support the conclusion that high-minority counties use absentee ballots more heavily was “not very strong.”
Certainly additional absentee ballots are rejected on account of the perfection requirement. But there is scant evidence in *628 the record that minority voters are more likely to cast absentee ballots than white voters. It would therefore be illogical to infer that rejecting absentee ballots for failure to accurately complete address and birthdate fields disproportionately affects minority voters without some other evidence that minority voters are less likely to fulfill those requirements. And, as discussed in more detail elsewhere, the vast majority of absentee-ballot rejections are for reasons other than those challenged here.
The .same is true of the limits that SB 205 places on poll workers. To be sure, the provision will impact the hypothetical early in-person absentee voter whose ballot would have been rejected in past elections but for now-prohibited forms of assistance. Yet the. record contains no evidence of how many, if any, voters received such additional “assistance.” Because evidence of higher minority absentee-ballot usage is weak, and the record does not indicate that minority voters disproportionately benefited from assistance that is now proscribed, plaintiffs have not demonstrated a disparate impact.
On their other Section 2 claims, the plaintiffs fail to show that the challenged provisions will have much of an impact on the right to vote at all. The district court reasoned that reducing the cure period from ten to seven days would burden illiterate voters and voters for whom travel-ling to cure them ballots presents logistical difficulties. Hypothetically speaking, a scenario could exist where voters showed up in droves to correct absentee-ballot errors and to produce provisional-ballot ID during those three days. But that has not been the case in Ohio. In fact, the single election-board official whose trial testimony the district court cited in support of its conclusion stated that in Hamilton County, Ohio’s third most populous, “very few voters” cured their ballots during that three-day window. The record contains no evidence on the number of absentee or provisional voters who took advantage of the cure days eliminated by SB 205 and SB 216. A law cannot disparately impact minority voters if its impact is insignificant to begin with.
Challenges to SB 216’s perfection’ requirement of provisional voters and its limitation on poll-worker assistance suffer from the same shortcoming. The conclusion that SB 216 disproportionately impacts minority voters is not borne out in the data. For the vast majority of provisional voters whose ballots are rejected, no amount of help would change the result. The record contains provisional voting data for the 2008, 2010, 2012, 2014, and 2015 general elections. In every one of those elections, eighty to ninety percent of provisional voters whose ballots were rejected either had failed to register at all or voted in the wrong place. Placing a minor check on election workers’ interactions with in-person voters has no impact on the vast majority of provisional-ballot rejections.
SB 216 has been in effect during the two most recent general elections. The provisional ballots of 247 voters in 2014 and 373 voters in 2015 were rejected for failure to provide an accurate birthdate or address. Respectively, these figures represented about five and three percent of rejected provisional ballots — and less than one percent of all provisional ballots cast. What is more, the 2015 figure does not account for individuals whose 2014 ballots were rejected for failure to register but who accurately completed the affirmation form and successfully registered for the next election. Presumably, some of those voters would not have registered otherwise, which means that SB 216 has the effect of reducing the number of ballots rejected on the *629 basis of nonregistration in future elections. That impact helps to counter the small impact that SB 216 does have. Given the negligible impact of SB 216⅛ perfection requirement on ballot rejection, the plaintiffs have not shown that the provision disproportionately affects minority voters.
B. Literacy Test
Section 4 of the VRA provides that “[n]o citizen shall be denied” the right to vote “because of his failure to comply with any test or device.” 62 U.S.C. § 10601(a) (Supp. II Vol. Ill 2016). “Test or device” is defined as a requirement that, as a prerequisite to vote or register, a person demonstrate the ability to “read, write, understand, or interpret any matter,” demonstrate “educational achievement” or “knowledge” of any subject, “possess good moral character,” or have others “vouch[ ]” for them. Id. § 10501(b)..
The district court found that § 10501 includes a private right of action before concluding that the challenged provisions do not violate the statute. Even if a private right, of action is permitted, we agree with the district court that SB 205 and SB 216 do not impose a “test or device” on Ohio voters.
The plaintiffs equate the requirement that absentee and provisional voters accurately complete address and birthdate fields with the “vague, arbitrary, hyper-technical or unnecessarily difficult” tests cited' by Congress as evidence of the urgent need for the VRA. H.R. Rep. No. 89-439, at 13 (1965). However, requiring voters' most basic biographical and personal information' bears no similarity to sfelec-tively enforced voting tests whose “only real function” is to “foster racial discrimination.” Ibid.; see also id. at 12 (citing United States v. Louisiana, 225 F.Supp. 353, 358 (E.D. La. 1963) (three-judge panel finding a Louisiana Constitution requirement that registration applicants be able to read and “give a reasonable interpretation” of any- clause of the Louisiana or United States Constitution violated Fourteenth and Fifteenth Amendments), aff'd, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)); S. Rep. 89-162, pt. Ill, at 11-12 (1965) (cataloging cases of “discriminatory misuse” of literacy tests and “good moral character” requirements). The address- and-birth-date requirements simply do not fall within the meaning of “test or device,” as used in the statute. 52 U.S.C. § 10501(b). To the extent that the House Report censures “‘perfect form’ requirements,” no such prohibition appears in the text of the statute itself. Compare H.R. Rep. 89-439, at 13, with 52 U.S.C. § 10501. In these circumstances, the unambiguous language of the statute must prevail. See Rote v. Zel Custom Mfg. LLC, 816 F.3d 383, 394 (6th Cir. 2016) (heeding Supreme Court’s “admonishment to courts not to add any unexpressed requirements to the language of the statute” (quoting Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 818 (6th Cir. 2002))).
To the extent that-recording birthdate or address proves difficult for some voters, Ohio explicitly permits election officials to assist those who are blind, disabled, or illiterate in marking their ballots. See Ohio Rev. Code §§ 3505.24(B), 3505.181(F). The plaintiffs’ supposition that the stigma of illiteracy deters some voters from requesting assistance distracts from the focus of the inquiry — state action. To fill the address and birthdate fields,, voters need not “demonstrate the.ability” to read or write any more so than- they do to otherwise complete a ballot.
C. Immaterial Error
 The VRA provides that no one acting under color of law may “deny the right of any individual to vote in any elec *630 tion because of an error or omission” on a registration application or voting ballot if the error or omission “is not material” in determining whether the individual is qualified to vote. 52 U.S.C. § 10101(a)(2)(B) (Supp. II Vol. Ill 2015). A later subsection of § 10101 states that when any person has deprived another of “any right or privilege secured by subsection (a) ... , the Attorney General may institute for the United States ... a civil action or other proper proceeding for preventive relief.” Id. at § 10101(c).
We have held that the negative implication of Congress’s provision for enforcement by the Attorney General is that the statute does not permit private rights of action. See McKay v. Thompson, 226 F.3d 752, 756 (6th Cir. 2000). Another circuit later reached the opposite conclusion. See Schwier v. Cox, 340 F.3d 1284, 1294-96 (11th Cir. 2003). It reasoned, in part, that the Supi’eme Court had found other VRA sections enforceable by private right of action despite their provision for Attorney General enforcement and that before the Attorney General language was appended to the statute, plaintiffs “could and did” bring enforcement actions under 42 U.S.C. § 1983. Id. at 1295.
“A panel of this court may not overturn binding precedent because a published prior panel decision ‘remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.’ ” United States v. Elbe, 774 F.3d 885, 891 (6th Cir. 2014) (quoting Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir. 1985)). McKay v. Thompson therefore binds this panel. The plaintiffs may not bring an action for a violation of § 10101(a).
V. Equal-Protection Claims
Three equal-protection questions are at issue on appeal: Whether the challenged provisions (1) unduly burden the right to vote; (2) result in a lack of uniform standards; and (3) were enacted with a discriminatory purpose. Once again, we review the district court’s legal conclusions de novo and factual findings for clear error.
A. Undue Burden
1. Legal Standard
The certainty that every election law places at least some burden on individual voters demands that courts weigh that hindrance against the provision’s regulatory justification. On one hand, “voting is of the most fundamental significance under our constitutional structure.” Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). On the other, “[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.” Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Acknowledging this tension, the Supreme Court has articulated a “flexible standard” to apply when considering challenges to state election law:
A court ... must weigh “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate” against “the precise interests put forward by the State as justifications for the burden imposed by its rule,” taking into consideration “the extent to which those interests make it necessary to burden the plaintiffs rights.”
Id. at 434, 112 S.Ct. 2059 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).
*631 In practice, the level of scrutiny into a challenged election law varies based on the severity of its constraint on voting rights. “[S]evere restriction^]” must be “narrowly drawn to advance a state interest of compelling importance.” Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). At the other end of the spectrum, “minimally burdensome and nondiscriminatory” regulations inevitably result in “a less-searching examination.” Ohio Council 8 Am. Fed’n of State v. Husted, 814 F.3d 329, 335 (6th Cir. 2016). For regulations that “fall[] somewhere in between the two extremes, ‘the burden on the plaintiffs is weighed against the state’s asserted interest and chosen means of pursuing it.’” Ibid, (quoting Green Party of Tenn. v. Hargett, 767 F.3d 533, 546 (6th Cir. 2014)) (alteration omitted). As a general matter, “important regulator interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.” Anderson, 460 U.S. at 788, 103 S.Ct. 1564.
In striking portions of SB 205 and SB 216, the district court considered the burdens that the provisions impose on NEOCH’s and CCH’s homeless and illiterate members. Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst. In Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), the Supreme Court upheld an Indiana voter-ID law. The plaintiffs urged the Court to consider the burden imposed on the “narrow class of voters” who could not afford or obtain a birth certification and had to return to the circuit court clerk’s office after voting. Id. at 200, 128 S.Ct. 1610 (opinion of Stevens, J.). The lead opinion refrained from weighing the “special burden” faced by “a small number of voters” because the evidence on the record gave “no indication of how common the problem is,” which made it impossible “to quantify ... the magnitude of the burden.” Id. at 200, 202, 128 S.Ct. 1610. A concurrence rejected outright the idea of measuring the burden on a subset of voters. “[W]hat petitioners view as the law’s several light and heavy burdens,” it reasoned, “are no more than the different impacts of the single burden that the law uniformly imposes on all voters.” Id. at 205, 128 S.Ct. 1610 (Scalia, J., concurring in the judgment).
In any event, the district court erred by weighing Ohio’s regulatory interests against the burden that the challenged provisions uniquely place on homeless and illiterate voters.[10] Even under the controlling opinion’s more liberal approach to burden measuring, the record here is devoid of quantifiable evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised as a result of SB 205 and SB 216. We therefore consider the burden that the provisions place on all Ohio voters.
2. SB 205 and SB 216
Address and Birthdate Requirements. Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters. As discussed, see supra p. 628, in the 2014 and 2015 general elections, 620 provisional ballots were rejected as failing to *632 meet SB 216’s address and birthdate perfection requirements, out of a total of 16,-942 rejections. Among over 860,000 domestic civilian absentee ballots cast in 2014 and 430,000 in 2015, 1378 ballots were rejected in 2014, and 334 in 2015, for failure to comply with the similar provision in SB 205.[11]
Considering the number of total ballots cast in a general election in Ohio, these figures are small. And yet, as demonstrated through voter declarations and the testimony of board officials, the formal rigidity of the challenged requirements may leave no room for elections boards to make their own judgments on voter eligibility. As a result, identifiable voters may be disenfranchised based only on a technicality. For example, transposing the location of the month and year numerals of a birth-date, writing the current date by mistake, and inverting digits in an address have been cited by elections boards as. reasons for automatic ballot rejection. ■
A facial- challenge to a state law fails “where the statute has a ‘plainly legitimate sweep.’” Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting Washington v. Glucksberg, 521 U.S. 702, 740 n.7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments)). For SB 216, the interest in registering provisional voters outweighs the burden of. completing the address and birthdate fields. Most provisional-ballot rejections occur in Ohio because the purported voter was not registered. In 2012, a presidential-election year, over 20,000 provisional ballots were rejected for failure to register. Ohio uses the affirmation form to register the unregistered provisional voters who unsuccessfully try to east ballots each year.
The additional fields also help elections boards positively identify provisional voters. For their ballots to be counted, provisional voters must be located in a statewide database of registered voters. Predictably, entering a provisional voter’s name and the last four digits of their Social Security number into the database can result in multiple hits. -Birthdate and address information can narrow the plausible registered voters and assist in confirming an eligible voter’s right to vote (and vice versa). Ohio’s important interests in provisional-voter registration and identification eclipse the small burden of accurately completing the two fields — a burden' that actually impacts just a few hundred voters each election, an impact wholly in their own control.
However, we agree with the district court that Ohio has made no such justification for mandating technical precision in the address and birthdate fields of the absentee-ballot identification envelope. Although the burden is small for most voters, its impact is greater than that of SB 216, and none of the “precise interests put forward by” Ohio justifies it. Burdick, 504 U.S. at 434, 112 S.Ct. 2059 .(citation omitted). Ohio first posits that the perfection requirement hampers “rare[ ]” attempts to cast others’ mail-in absentee ballots. First Br. 30, Combatting voter fraud perpetrated by. mail is undeniably a legitimate concern. Nee Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam). Yet some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh. The district court found that Ohio did not even “offer[ ] combatting voter fraud” as a rele *633 vant interest. Given the lack of any coherent fraud argument offered at trial, that conclusion is understandable.
Moreover, Ohio’s argument collapses under scrutiny. Before SB 205, absentee voters had to clear several hurdles to confirm their identity. In addition to presenting valid identification, a voter needed the signature on the envelope to match the voter’s registration signature, and even then, the information in the identification envelope could be deemed “insufficient.” Ohio Rev. Code § 3509.07 (2013); see also id. §§ 3509.05-06, 3511.09. Like all other ballots, those of absentee voters could be challenged “for cause.” Id. § -3509.07. Under some circumstances, certain errors in address or birthdate could well constitute “insufficiency.” SB 205 altered that provision, requiring boards to reject absentee ballots that do not include an ’ accurate address and birthdate for the voter. ■
Even Ohio recognizes that the downside of rejecting mail-in absentee ballots for address errors overshadows any concern with address falsification. Ohio statute allows, and the Secretary -has instructed, boards of elections to complete the address field on mail-in identification envelopes so that ballots are not thrown out “for th[at] sole reason,” At bottom, Ohio’s interest revolves around the “rare” instances where a fraudster manages -to swipe the ballot of a registered absentee voter, forge the signature, and return the ballot to the board of elections with a copy of the voter’s identification, driver’s license number, or Social Security number, and would have gotten away scot free but for the troublesome ..birthdate requirement. What is more, Ohio does, not explain why its interest in preventing voter fraud by mail makes it “necessary to burden” the plaintiffs’ voting rights. Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (citation omitted). Before SB 205, boards were. instructed to strike ballots if the identification envelope contained “insufficient” information and had discretion to “challenge” absent voters “for cause.” Ohio Rev. Code § 3509.07 (2013). That provision gave boards more than sufficient flexibility to investigate birthdate errors for fraud without the heavy-handed requirement of ballot rejection on a technicality.
At trial, the district court was not presented with a shred of evidence of mail-in absentee-voter fraud. That absence of support is corroborated by ample testimony. Halfway through trial, the court held a sidebar where it asked counsel for Ohio whether a fraud argument was “going to be a part of the presentation of ... [Ohio’s] case in chief, ... experts, [or] other witnesses.” Counsel stated that the court “w[ould] hear testimony” about the interests motivating the passage of the bills, including fraud. N.ot only did that never materialize, but, as is apparent from the record, there is no indication of a legitimate fraud concern at all. The Assistant Secretary of State, responsible for managing statewide elections, affirmed upon cross-examination that the possibility of this particular voter fraud is “infinitesimal” and would not have been “an appropriate justification” for SB 205’s perfection requirement. None of the officials who testified from nearly a quarter of Ohio’s boards of elections were even asked whether requiring perfection on the birth-date field would combat mail-in absentee-voter fraud. At the court’s own prodding, several answered questions related to fraud. The few who could relate instances of fraud identified none relating to the specific, interest now asserted. This suggests that the fraud interest does not offset the burden of technical perfection on the identification envelope’s address and birthdate fields.
*634 Ohio also asserts an interest in standardizing its identification-envelope requirements. Achieving uniform standards across eighty-eight autonomous county boards of elections is a commendable goal. A court weighing that interest, however, must ask, “Standardization to what end?” For example, a standardized ballot may increase public confidence in the integrity of the electoral process. See Crawford, 553 U.S. at 235, 128 S.Ct. 1610 (Souter, J., dissenting). According to Ohio, SB 205⅛ perfection requirement “increases efficiency and predictability.” First Br. 32.
In support, Ohio cites just two pieces of evidence. During his testimony, the Assistant Secretary of State stated that before the implementation of SB 205, the birth-date field was “a required element on the [identification envelope, but] was not a required element for the Board to determine the validity of the ballot.” Although true, that statement does not address whether that distinction was thought by anyone to make election administration less efficient. Ohio also points to a report of the OAEO advising that requiring mail-in voters to complete the address and birthdate fields, among other measures, would “allow election officials to more efficiently process mail-in absentee ballots.” However, that document was silent with regard to in-person absentee ballots. Moreover, it was not a recommendation to reject ballots containing technical errors, and so cannot support the argument that a uniform rejection standard increases efficiency.
Nor does Ohio’s interest in uniformity “make it necessary to burden” the right to vote with a technical-perfection requirement. Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (citation omitted). Even before SB 205, Ohio law instructed boards of elections on the information to include in absentee-voter identification envelopes. See Ohio Rev. Code § 3509.04(B) (2013). It would seem- that the simple act of amending that provision to more comprehensively describe the information that identification envelopes should contain would have been a less roundabout way to uniformity — and would not have needlessly disenfranchised voters. In addition, Ohio publishes a lengthy manual for election officials with extensive instructions on how to apply its statutory election provisions. It includes a “Reasons to Reject an Absentee Ballot” section. Ohio could include instructions explaining the steps that officials should take to positively identify voters before determining that an identification envelope is sufficient or insufficient. Instead, the legislature enacted a; measure that forces elections boards to reject some identifiable ballots. We cannot find that Ohio’s stated interests outweigh the burden that the field-perfection requirement places on absentee voters.
Limit on Poll-Worker Assistance. The burden imposed by demarcating the types of assistance that election officials may render voters is minimal. In most cases, poll-worker assistance will not fix the errors that result in the rejection of absentee and provisional ballots. As discussed, most rejected provisional ballots were not counted because the applicant was not registered at all or tried to vote in a precinct where her or she was not registered. Domestic civilian absentee ballots were usually rejected just for being submitted late — sixty-three percent of rejected ballots in 2014 and over eighty percent in 2015. All voting requirements inevitably encumber some people more than others. Yet Ohio specifically ensures that voters at the greatest risk of making mistakes in marking their ballots — blind, disabled, and illiterate individuals — receive help if it is requested. The onus is on the voter to make the request, but that hardly impinges the right to vote. Any burden is *635 borne only by those who can but do not ask for help or make easily avoidable errors in marking their ballots.
Ohio’s legitimate interest in minimizing election-official mistakes by ensuring that they are not overburdened and do not fill in others’ personal information justifies the limitation placed on poll-worker assistance.[12] Because Ohio asserts a legitimate interest, this minimally burdensome regulation does not amount to an unconstitutional abridgment of the right to vote.
Cure-Period Reduction. As discussed, on the basis of the record, reducing from ten to seven the number of days for correcting absentee-ballot errors and presenting provisional-ballot identification imposes a trivial burden on Ohio voters. There is no evidence of the magnitude of the burden and at least one board official testified that few voters even used the final three cure-period days.
That minimal burden on voting is easily outweighed by Ohio’s interest in reducing the administrative strain felt by boards of elections before they begin to canvass election returns. The official canvass must begin eleven to fifteen days after Election Day. Ohio Rev. Code. § 3505.32(A). The possibility of unforeseeable post-election issues thrust upon boards is a legitimate concern. Building in a three-day buffer between the cure period and the official canvass is a common-sense solution. Although, as the district court noted, none of the board officials who testified indicated that the ten-day cure period inconvenienced them, a state certainly need not wait for an election issue to arise before enacting provisions to avoid it. See Munro v. Socialist Workers Party, 479 U.S. 189, 195-96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). Federal law does require that voting equipment give voters the opportunity to correct errors before their ballots are cast and counted. See 52 U.S.C. § 21081(a)(l)(A)(ii) (Supp. II Vol. Ill 2015). But no case mandates any particular length of time that states must provide after Election Day for voters to cure ballot errors. Given the negligible impact of the cure-period reduction on voters, Ohio’s reasonable response to a foreseeable problem is not an undue burden.
B. Lack of Uniform Standards
A plaintiff may State an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live. League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 477-78 (6th Cir. 2008). The district court rejected the plaintiffs’ argument that the boards of elections used different standards in the two most recent general elections for determining whether to reject absentee and provisional ballots that contained errors or omissions. We agree.
The plaintiffs presented uncontested evidence that, in determining whether to reject a given, ballot, the practices of boards, of elections can vary, and sometimes considerably. But that does not address the central question in a lack-of-uniform .standards claim: whether Ohio lacks “adequate statewide standards for determining what is a legal vote.” Bush v. *636 Gore, 531 U.S. 98, 110, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam). Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results. In fact, that flexibility is part and parcel of the right of “local entities, in the exercise of their expertise, [to] devélop different systems for implementing elections.” Id. at 109, 121 S.Ct. 525. Despite differences in the local application of provisions concerning ballot rejection, the elections boards are guided by clear prescriptive statewide rules that apply equally to all voters. Nor is there any indication that certain categories of provisional or absentee ballots received “preferential treatment.” Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 598 (6th Cir. 2012); see also Hunter v. Hamilton Cty. Bd. of Elections, 635 F.3d 219, 236 (6th Cir. 2011). Thus, the district court correctly concluded that the plaintiffs did not prove arbitrary treatment.
C. Intentional Discrimination
Facially neutral laws can be motivated by invidious racial discrimination. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Because of the possibility that discriminatory intent is an underlying motivation, courts must undertake a “sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” Ibid. Challengers need to show only that discriminatory purpose was “a motivating factor,” not necessarily the law’s “dominant” or “primary” purpose. Id. at 265-66, 97 S.Ct. 555.
In Arlington Heights, the Supreme Court articulated nonexhaustive evidentia-ry factors to consider in determining whether official action was undertaken with a discriminatory purpose. Those factors include:
“[T]he historical background of the decision, ... particularly if it, reveals a series of official actions taken for invidious purposes”; “the specific sequence of events leading up [to] the challenged decision”; “departures from the normal procedural sequence”; “substantive departures, ... particularly if the factors usually considered important by the de-cisionmaker strongly favor a decision contrary to the one reached”; and the “legislative or administrative history, ... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.”
Spurlock v. Fox, 716 F.3d 383, 397 (6th Cir. 2013) (quoting Arlington Heights, 429 U.S. at 267-68, 97 S.Ct. 555) (alterations omitted).
The record does not Reveal that SB 205 and SB 216 were enacted with discriminatory intent. As discussed, the evidence does not demonstrate that minority voters are disproportionately affected by the provisions. Nor did the legislature depart from normal procedural practices when it considered the provisions for several months before their passage. Cf. N.C. State Conference of the NAACP v. McCrary, 831 F.3d 204, 228-29, Nos. 16-1468, 16-1469, 16-1474, 16-1529, 2016 WL 4053033, at *13 (4th Cir. July 29, 2016) (law passed with discriminatory intent in part due to legislature’s “eagerness,” after Shelby County held unconstitutional Section 5’s preclearance requirement, to “rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow”). In fact, the basic contours of SB 205 originally appeared in a report of the bipartisan OAEO.
*637 A racially tinged statement by one legislator who allegedly asked during committee debate whether the General Assembly “should ... be making it easier for those people who take the bus after church on Sunday to vote” is troubling. Cf. Ohio State Conference, 768 F.3d at 539 (“African Americans have come to rely on Sunday voting through ‘Souls to the Polls initiatives,’ in which churches have leveraged the transportation they already provide to and from church to bring voters to EIP voting locations.”). But we agree with the district court that on the whole, the record does not show that the General Assembly acted with racial animus.
VI. Due Process
The Due Process Clause is implicated in “exceptional” ' cases where a state’s voting system is “fundamentally unfair.” Warf v. Bd. of Elections, 619 F.3d 553, 559 (6th Cir. 2010) (quoting League of Women Voters of Ohio, 548 F.3d at 478). Fundamental unfairness may occur, for example, if a state uses non-uniform procedures that result in significant disenfranchisement and vote dilution. See League of Women Voters of Ohio, 548 F.3d at 478. “[GJarden variety election irregularities,” however, do. not prove fundamental unfairness. Griffin v. Burns, 570 F.2d 1065, 1076, 1078-79 (1st Cir. 1978). The district court rejected, the plaintiffs’ fundamental-unfairness claim, and we affirm.
As discussed in response to the argument that Ohio’s voting system lacks uniform standards, discrepancies at the margins in how local boards of elections apply statewide provisions is not unusual. Those predictable divergences impact a small number of voters and do not amount to a fundamentally unfair voting system. Nor do the technical-perfection requirements that SB 205 and SB 216 impose on absentee and provisional voters rise to an exceptional level of unfairness' comparable to grossly non-uniform procedure or significant.voter disenfranchisement.
We also find unconvincing the appellees’ contention that the district court denied their procedural-due-process claim “without addressing its merits.” Second Br. 75. The district court clearly held that the alleged -harm was “caused by the portions of SB[] 205 and SB 216 that impose a completion requirement for the five fields, not the lack of process given when a ballot is .rejected.” Ne. Ohio Coal. for the Homeless v. Husted, No. 2:06-CV-896, 2016 WL 3166251, at *43 (S.D. Ohio June 7, 2016) (emphasis- added). We therefore dismiss this claim.
VII. Conclusion
We AFFIRM the entry of judgment for the plaintiffs on their equal-protection undue-burden claim as it relates to the requirement that boards of elections reject mail-in and in-person absentee ballots for failure to complete the identification envelope’s . address and birthdate fields with technical precision, Therefore, we AFFIRM its permaneht injunction of the portions of SB 205 that amend Sections 3509.06(D) and 3509.07 of the . Ohio Revised Code. See S.B. 205, 130th Gen. Assemb. (Ohio 2014), at 9-12.
To be perfectly clear, this remaining injunction does not impede the legitimate interests of Ohio election law. The. versions of Sections 3509.06(D) and 3509.07 that existed before the enactment of SB 205 (and that the injunction effectively reinstates) were altogether serviceable. Nothing in our opinion prevents election officials from rejecting absentee ballots whose identification envelopes contain “insufficient” information. Ohio ■ Rev. Code. § 3509.07 (2013). .The Secretary can and should continue to instruct the boards of elections on implementing those provisions *638 in order to further the interest of uniformity and to provide guidance on the steps boards should take to identify absentee voters before deeming an identification envelope “insufficient.” And, within the bounds of the Fourteenth Amendment, the General Assembly has .authority to modify its elections laws in the future. But in doing so, it must act to further important State interests if its proposed changes burden Ohioans’ right to vote.
We deeply respect the dissent’s recounting of important parts of the racial history of our country and the struggle for voting rights, and we agree that this history may always be appropriately borne in mind. However, that history does not without more determine the outcome of today’s litigation over voting practices and methods. The legal standards we must follow are set out in the cases we discuss concerning the standards embodied in the Fourteenth Amendment and Section 2 of the Voting Rights Act. With respect to the dissent’s discussion regarding factual findings, this opinion does not quarrel with the district court over its recitation of the record or of any credibility determinations made by the district court. Rather, our holding is that the district court’s legal conclusions from that record are in certain parts erroneous, as set forth in this opinion, and in light of other parts of the record that the court did not consider.
For reasons stated, we REVERSE the judgment of the district court on the remaining undue-burden claims and the VRA Section. 2 claims. We AFFIRM the entry of judgment for Ohio on all other claims.

. The birthdate requirement is satisfied if the voter provides a month and day of birth that match the month and day in the registration database, if the birthdate in the registration database is January 1, 1800, or if a majority of the four-member elections, board find that the voter has met the name, address, signature, and identification requirements. Ohio Rev. Code § 3509.06(D)(3)(a)(iii).

. The identification requirement for provisional voters is similar to that for absentee voters. See Ohio Rev, Code § 3505.18(A).

. The birthdate requirement for provisional voters has similar exceptions to those for the requirement for absentee voters. See Ohio Rev. Code § 3505.183(B)(3)(e).

.Within days of the plaintiffs’ tiling suit, Ohio intervened as a defendant. See Fed. R. Civ. P. 24(b). With the parties’ consent, the Ohio Democratic Party (ODP) intervened as a plaintiff in 2008. Soon after, the Columbus Coalition for the Homeless (CCH) was added as a plaintiff.

. ' Ohio law requires elections boards to ‘‘examine any additional information” in addition to "determining] whether the individual who cast the provisional ballot is registered and eligible to vote in the applicable election” in order to "determine whether a provisional ballot is valid and entitled to be counted.” Ohio Rev. Code. § 3505.183(B)(l)-(2). The original complaint alleged that elections boards would not “apply the same standards when .... determining whether provisional ballots are eligible to be counted.”

. In August 2015, plaintiff Ohio Organizing Collaborative moved to substitute three parties in its place, including ODP, and to "drop ... claims' that overlap with those in" this case. Ohio opposed the latter motion. The court granted the substitution request but denied the motion to amend. Ohio Org. Collabo *623 rative v. Husted, No. 2:15-cv-1802 (S.D. Ohio Sept. 2, 2015) (opinion and order).

. Although the dissent repeatedly classifies our review as de novo, our approach is consistent with established precedent in reversing the district court where the overall record is *626 inconsistent with the findings. See, e.g., Indmar Prod. Co. v. Comm’r, 444 F.3d 771, 778 (6th Cir. 2006) ("[W]hile our review is deferential, it is not nugatory.”).

. Timberlake did not separately analyze in-person absentee voting and mail-in absentee voting.

. Illiterate voters may request and receive assistance in marking their ballots from nearly “any person of the[ir] ... choice,” including "two election officials of different political parties.” Ohio Rev. Code. § 3505.24. Homeless voters may register their address as “a shelter or other location at which the person has been a consistent or regular inhabitant and to which the person has the intention of returning.” Id. § 3503.02(1).

. In addition, 633 domestic civilian absentee ballots were rejected in 2014, and 346 in 2015, because the voter ID envelope "[cjon-tains [ijnsufficiient [sic] [i]nformation.” Cf. Ohio Rev. Code § 3509.07(A).

. Although not argued by Ohio on appeal, states have an important interest in managing poll-workers’ interaction with voters to protect ballot secrecy and prevent coercion. See, e.g., Burson v. Freeman, 504 U.S. 191, 206, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) ("[A]ll 50 States, together with numerous other Western democracies ... [have] a secret ballot secured in part by a restricted zone around the voting compartments,” which “demonstrates that some restricted zone is necessary in order to serve the States’ compelling interests in preventing voter intimidation and election fraud.”).