RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MEMPHIS A. PHILIP RANDOLPH INSTITUTE; THE EQUITY ALLIANCE; FREE HEARTS; MEMPHIS AND WEST TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL; THE TENNESSEE STATE CONFERENCE OF THE NAACP; SEKOU FRANKLIN,

       *Plaintiffs-Appellees*,

    *v.*

TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee; MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; AMY P. WEIRICH, in her official capacity as District Attorney General for Shelby County, Tennessee,

       *Defendants-Appellants*.

No. 20-6141

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00374—Eli J. Richardson, District Judge.

Argued: December 15, 2020

Decided and Filed: June 22, 2021

Before: MOORE, GIBBONS, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Danielle Lang, CAMPAIGN LEGAL CENTER, Washington, D.C., for Appellees. **ON BRIEF:** Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Danielle Lang, Jonathan Diaz, Molly Danahy, Ravi Doshi, Caleb Jackson, CAMPAIGN LEGAL CENTER,

Washington, D.C., Ezra D. Rosenberg, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., for Appellees.

GIBBONS, J., delivered the opinion of the court in which READLER, J., joined. READLER, J. (pp. 14–18), delivered a separate concurring opinion.  MOORE, J. (pp. 19–35), delivered a separate dissenting opinion.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge.  This is the third time these parties have appeared before this panel in a Tennessee election law dispute.  This time, defendants appeal the district court's order granting plaintiffs a preliminary injunction enjoining the enforcement of a law preventing first-time voters from voting by mail.  We previously denied defendants' motion to stay the injunction pending this appeal.  However, after the benefit of full briefing and oral argument, we now vacate the preliminary injunction.

I.

In the months prior to the November 2020 elections, there was increased attention placed on absentee voting due to the COVID-19 pandemic.  Tennessee allows several categories of voters to vote absentee, including those who will be outside of their registered county during the election period, persons over 60, and those who are "hospitalized, ill or physically disabled, and because of such condition, . . . unable to appear at the [their] polling place on election day." Tenn. Code Ann. § 2-6-201.  Tennessee has acknowledged that the latter category includes "persons with special vulnerability to COVID-19 or who are caretakers of persons with special vulnerability to COVID-19." *Fisher v. Hargett*, 604 S.W.3d 381, 393 (Tenn. 2020).

First-time voters who register by mail or online, however, cannot vote absentee even if they fall into one of the approved categories, with limited exceptions.  Tenn. Code Ann. § 2-2-115(b)(7).  These first-time voters must vote in person so that they can present a form of identification.  *Id.*  Tennessee claims this requirement is necessary to prevent fraudulent voting. Because individuals do not present a form of photo identification when registering to vote by mail, Tennessee argues that allowing first-time voters to vote by mail will lead to "ghost voting"

where the signatures on the voter's registration and absentee ballot match but the state cannot verify the voter's identity.

On May 1, 2020, plaintiffs—two individuals registered to vote in Tennessee and five Tennessee organizations—brought this lawsuit challenging several Tennessee voting laws. Defendants are three Tennessee government officials involved in election enforcement. On June 12, 2020, Plaintiffs amended their complaint and added a claim contesting Tennessee's first-time voter restriction under Tenn. Code Ann. § 2-2-115(b)(7). That same day, they filed a motion for preliminary injunction seeking to enjoin the enforcement of § 2-2-115(b)(7).

On September 9, 2020, the district court granted plaintiffs' motion for a preliminary injunction as to the first-time voter restriction and issued an order enjoining the enforcement of § 2-2-115(b)(7). Defendants filed a motion to stay the injunction, and a motion for reconsideration. The district court denied both motions.

Defendants then filed a notice of appeal, and a motion to stay the preliminary injunction in this court. We previously denied the motion to stay, and now consider the merits of the preliminary injunction.

II.

When deciding whether to grant a preliminary injunction, courts must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Livingston County*, 796 F.3d at 642 (alteration in original) (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke*

*Corp.*, 511 F.3d 535, 546 n.2 (6th Cir. 2007) ("[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits.").

Whether the movant has a strong likelihood of success on the merits is a question of law, which this court reviews de novo. *Ammex, Inc. v. Wenk*, 936 F.3d 355, 359−60 (6th Cir. 2019) (quoting *City of Pontiac Retired Emps. Ass'n v. Shimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). We review the "district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" for abuse of discretion. *Shimmel*, 751 F.3d at 430. Under the abuse-of-discretion standard, we will reverse the district court "if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Id.* We review the district court's factual findings for clear error. *Ammex, Inc.*, 936 F.3d at 360.

### III.

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Shimmel*, 751 F.3d at 430 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). In addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018). If a plaintiff cannot show a likelihood of jurisdiction, then the court will deny the preliminary injunction. *Id.* Here, defendants raise two jurisdictional challenges: standing and mootness.

### A.

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. III, § 2; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). Standing is a core component of this "case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. To establish standing to sue, a plaintiff must show (1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision. *Id.* at 560–61. A plaintiff asking for declaratory or injunctive relief must also "show actual present harm or a significant possibility of future harm." *Grendell*

*v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). An organization may have standing either in its own right, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (Cir. 2016), or it may have associational standing on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). If one party has standing, then identical claims brought by other parties to the same lawsuit are also justiciable. *See Ne. Ohio Coal. for the Homeless*, 837 F.3d at 623.

Here, the district court found that one plaintiff, The Tennessee State Conference of the NAACP ("Tennessee NAACP"), had associational standing through a single member, Corey DeWayne Sweet, an individual resident of Tennessee. *Memphis A. Phillip Randolph Inst. v. Hargett*, 485 F. Supp.3d 959, 978−79 (M.D. Tenn. 2020). Sweet submitted two declarations before the district court. His first declaration was signed on July 6, 2020 and was attached to plaintiffs' reply to their motion for a preliminary injunction. Sweet stated that he was twenty years old, had never voted before, and registered to vote online in Shelby County, Tennessee in late May or early June of 2020. Sweet also said he "occasionally attend[s] events of the Tennessee State Conference of the NAACP" and was a student at Xavier University in Louisiana. DE 54-4, Sweet Dec. 1, Page ID 2300. At the time, Sweet was taking remote classes because of the COVID-19 pandemic and did not know whether he would return to in-person learning for the fall semester starting in August 2020. He wished to vote by mail in the upcoming Tennessee elections because he was concerned about the risk of exposure to COVID-19 and because he could not afford to return to Tennessee to vote if he resumed in-person classes in Louisiana.

The district court determined that plaintiffs had put forth a sufficient showing that Sweet was a Tennessee NAACP member, but it noted that the evidence was "far from strong." *Memphis A. Phillip Randolph*, 485 F. Supp. 3d at 1006. The district court relied on Sweet's first declaration, which stated that Sweet occasionally attends NAACP meetings, and on the fact that

defendants had not challenged Sweet's membership in their motion to dismiss for lack of standing (filed after plaintiffs filed their motion for the preliminary injunction). *Id.* Thus, the district court accepted plaintiffs' representation that Sweet was an NAACP member, but warned that plaintiffs "should advise the Court immediately if, contrary to the Court's current understanding, Sweet is not actually a member of NAACP." *Id.* at 978 n.10 (emphasis omitted). The next day, plaintiffs filed Sweet's second declaration, in which Sweet stated that "I am a member of the Memphis Branch of the Tennessee State Conference of the NAACP." DE 86-2, Sweet Dec. 2, Page ID 2670.

On appeal, defendants' only challenge to plaintiffs' Article III standing is whether plaintiffs demonstrated that Sweet is a member of the Tennessee NAACP. Defendants claim that neither of Sweet's declarations demonstrate that he was a Tennessee NAACP member at the time the amended complaint was filed. According to defendants, Sweet's use of the present tense in his second declaration only proves that he was a member when the declaration was filed, not that he was a member when the amended complaint was filed.

While the evidence that Sweet is a Tennessee NAACP member is not definitive, the district court's factual finding that Sweet was a member is not clearly erroneous. A factual finding is clearly erroneous when this court is "left with the definite and firm conviction that a mistake has been committed" after reviewing the full record. *United States v. Collins*, 799 F.3d 554, 594 (6th Cir. 2015) (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)); *see also United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010) ("To be clearly erroneous, . . . a decision must strike [this Court] as more than just maybe or probably wrong." (alterations in original) (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)). There are several facts in the record that suggest Sweet was a member of the Tennessee NAACP when the amended complaint was filed. First, there is his initial declaration where he stated that he "occasionally attend[s] events" of the Tennessee NAACP. DE 54-4, Sweet Dec., Page ID 2300. Second, after being admonished by the district court to confirm Sweet's membership, Sweet and his grandmother Gloria Jean Sweet-Love, the president of the Tennessee NAACP, both submitted declarations stating that he was a member. Defendants' argument that Sweet's use of the present tense in his second declaration negates its probative value as to the time of filing is

unpersuasive. While it would have been preferable for Sweet to say explicitly when he became a Tennessee NAACP member, the evidence that: (1) he said he "is a member" in September 2020 and (2) had previously attended Tennessee NAACP events make it plausible that he was also a member in June 2020 when the amended complaint was filed. Although the record is sparse, the district court's finding that Sweet was a member was not clearly erroneous.

If Sweet was a member, then the Tennessee NAACP had associational standing to challenge the first-time voter restriction at the time the amended complaint was filed. If not for the first-time mail-in voter restriction, Sweet would likely have been eligible to vote by mail under a Tennessee state-court preliminary injunction in place at the time, which allowed "any qualified voter who determines it is impossible or unreasonable to vote in-person at a polling place due to the COVID-19 situation" to vote absentee. *Fisher*, 604 S.W.3d at 392 (quoting Temporary Inj. Order, *Fisher v. Hargett*, No. 20-453-III (Tenn. Ch. Ct., 20th Jud. Dist. Jun. 4, 2020)). Thus, Sweet suffered an injury because the first-time voter restriction impeded his right to vote. Sweet's injury was fairly traceable to the first-time voter restriction and could have been readily redressed by an injunction barring its enforcement. Additionally, the interests at stake, including protecting voting rights, are germane to the NAACP's purpose, and neither the claim asserted nor the relief requested would require individual Tennessee NAACP members to participate in the lawsuit. *See Friends of the Earth*, 528 U.S. at 181. Accordingly, the district court properly concluded that the Tennessee NAACP, and by extension all plaintiffs, had shown a substantial likelihood of establishing associational standing through Sweet to challenge the first-time voter restriction.

Next, defendants claim that plaintiffs lack prudential standing to assert the rights of third parties. Generally, plaintiffs cannot establish standing based on the legal rights or interest of others. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). There are some exceptions to this rule, "such as where a 'close relationship' exists between the party asserting the right and the party possessing it or where a 'hindrance' exists to the possessor's ability to protect the right." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) (quoting *Kowalski*, 543 U.S. at 129–30) (finding that an organization engaged in voter outreach did not have prudential standing to assert the rights of unidentified third-party voters). Here, plaintiffs are asserting the legal rights

of their members, such as Corey Sweet, not of unidentified third parties. There is no prudential standing bar when member-based organizations advocate for the rights of their members. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (per curiam). Defendants' effort to analogize this case to *Fair Elections Ohio* fails, as does their claim that plaintiffs lack prudential standing.

Finally, while it is widely accepted that a plaintiff must establish standing at the time the lawsuit commences, it is perhaps less clear whether the standing requirement persists. Recently, the Supreme Court has implied that in certain cases a plaintiff may have to maintain standing throughout the lawsuit. *See Trump v. New York*, 141 S. Ct. 530, 536–37 (2020) (per curiam) (dismissing a case for lack of both standing and ripeness after the plaintiffs' basis for standing disappeared during the pendency of the action); *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (noting that the plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter"). The Supreme Court, however, has not explicitly overruled past precedent that confined the standing inquiry to the moment when the lawsuit was filed. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). We need not resolve this tension here, however, because mootness poses another Article III jurisdictional bar to plaintiffs' claim. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67 (1997) ("We may resolve the question whether there remains a live case or controversy . . . without first determining whether [plaintiffs have] standing to appeal because the former question, like the latter, goes to the Article III jurisdiction of this Court and the courts below, not the merits of the case."); *In re: 2016 Primary Election*, 836 F.3d 584, (6th Cir. 2016) (recognizing that this court has "discretion to address jurisdictional issues 'in any sequence we wish'" (quoting *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc))).

B.

Under Article III, federal courts may only adjudicate "actual, ongoing controversies." *Mwasaru v. Napolitano*, 619 F.3d 545, 549 (6th Cir. 2010) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)). An actual, ongoing controversy exists when there is a "genuine dispute[] between

adverse parties, where the relief requested would have a real impact on the legal interests of those parties." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006); *see also Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992). "If 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' then the case is moot and the court has no jurisdiction." *Libertarian Party of Ohio*, 462 F.3d at 584 (quoting *Los Angeles County v. Davis,* 440 U.S. 625, 631 (1979)). "The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss." *Id.* (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc)). "The heavy burden of demonstrating mootness rests on the party claiming mootness." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 531 (6th Cir. 2001).

Defendants argue that Sweet's individual claim, and by extension the claim of all the plaintiffs, is now moot. When plaintiffs filed their amended complaint on June 12, 2020, Sweet was eligible to vote absentee based on a June 4, 2020 state-court injunction of the first-time voter law, which construed Tenn. Code Ann. § 2-6-201(5) to permit "any qualified voter who determines it is impossible or unreasonable to vote in person at a polling place due to the COVID-19 situation" to vote absentee. *Fisher*, 604 S.W.3d at 392 (quoting Temporary Inj. Order, *Fisher v. Hargett*, No. 20-453-III (Tenn. Ch. Ct., 20th Jud. Dist. Jun. 4, 2020)). On August 5, 2020, the Tennessee Supreme Court vacated the June 4, 2020 injunction and imposed new, stricter guidelines. *Fisher*, 604 S.W.3d at 405. Under the new guidelines, § 2-6-201(5) only includes individuals who have a "special vulnerability to COVID-19 [or] are caretakers for persons with special vulnerability to COVID-19." *Id.* at 393.

After *Fisher*, Sweet no longer qualifies to cast an absentee ballot under Tenn. Code Ann. § 2-6-201. Sweet does not claim that he has a special vulnerability to COVID-19 or is a caretaker to someone who has a special vulnerability, only that he is concerned about the general risks of COVID-19. His concern that he may contract COVID-19, without more, is insufficient to meet the requirements the Tennessee Supreme Court articulated on August 5, 2020. Furthermore, Sweet does not appear to readily fit into any of the other categories of eligible absentee voters, particularly since he transferred to the University of Memphis in July 2020, so

there is no longer a possibility that he will be returning to Louisiana for school.

Based on this updated information, it appears that Sweet no longer has an actual, ongoing stake in this litigation. Even if this court affirmed the district court's preliminary injunction and continued to enjoin the first-time voter restriction, Sweet would not be eligible to vote absentee because he does not fall into any of the approved categories under Tenn. Code Ann. § 2-6-201 as interpreted by the Tennessee Supreme Court in *Fisher*. In his second declaration, Sweet stated that he might be eligible in the future if he becomes sick, is out of the county during the voting period, or is serving as a juror. Such speculation, however, does not make Sweet any more likely to be eligible to vote absentee than a general Tennessee voter and does not amount to an actual stake in this litigation. Simply put, the relief plaintiffs are requesting no longer has a real impact on Sweet's legal interests. If the outcome of this case will not affect his legal interests, Sweet's claim is moot. *See Libertarian Party of Ohio*, 462 F.3d at 584. And because the organizational plaintiffs relied entirely on Sweet to establish their legal interest in this case, they have not shown a substantial likelihood that they continue to have a legally cognizable interest. *See Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 207 (D.C. Cir. 2011) ("If [the association] has standing, it is only because at least one of [two identified members] has standing, and if the claims of both are moot, then [the association's] claims are moot as well." (citations omitted)); *see also Pro. Helicopter Pilots Ass'n Local 102 v. U.S. Dep't of the Army*, No. 1:13-CV-164-WKW, 2013 WL 6837555, at *6 (M.D. Ala. Dec. 26, 2013) ("Because the [organization's] associational standing hinges on the standing of its individual members, that later mooting of its members' claims also moots [the organization's] claims.").

Plaintiffs attempt to rely on this court's past reasoning in *Cleveland Branch, N.A.A.C.P. v. City of Parma* to argue that their general claim remains justiciable even if Sweet's claim is not. *See Waskul*, 900 F.3d at 257 (stating that *Cleveland Branch* "appear[s] to hold that even if a named member's claims had become moot, the association retained standing because the named member had standing at the outset of the litigation."). Plaintiffs and *Waskul*, however, conflate *Cleveland Branch*'s analysis of the standing redressability requirement with that case's mootness analysis. Standing and mootness, albeit related, are distinct doctrines with separate tests to evaluate their existence at different times of the litigation. *See Ohio Citizen Action v. City of*

*Englewood*, 671 F.3d 564, 580 (6th Cir. 2012) ("Standing is determined at the time the complaint is filed." (quoting *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004))); *McPherson*, 119 F.3d at 458 ("The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss."). Thus, plaintiffs cannot rely on *Cleveland Branch*'s standing analysis to save their case if Sweet's claim is now moot, given that Sweet is the only affected member plaintiffs have identified.[1]

The plaintiffs' claim also does not fit into the "capable of repetition, yet evading review" exception to the mootness doctrine. This exception "applies when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration and (2) there is a reasonable expectation or a demonstrated probability that the controversy will recur." *Libertarian Party of Ohio*, 462 F.3d at 584. "The party asserting that this exception applies bears the burden of establishing both prongs." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005). The second prong is "somewhat relaxed in election cases." *Id.* at 372. To be capable of repetition, "the chain of potential events does not have to be air-tight or even probable." *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016). The challenged action, however, is not capable of repetition if it is based on a unique factual situation. *See Libertarian Party of Ohio*, 462 F.3d at 584.

Our holding in *Libertarian Party of Ohio* helps define what constitutes a "unique factual situation." In that case, the Libertarian Party of Ohio ("LPO") sued the Ohio Secretary of State after its petition to form a political party for the 2004 primary election was rejected for including an outdated version of Ohio's election falsification notice. *Id.* at 582–83. LPO began distributing its petition in April 2001, but the Ohio legislature changed the election falsification

---

[1]In support of their opposition to defendants' motion for reconsideration before the district court, plaintiffs also submitted a declaration from Dawn Harrington, the executive director of plaintiff organization Free Hearts. DE 93, Harrington Dec., Page ID 2714–15. Harrington stated that Free Hearts member Myeisha Brown was eligible to vote in Tennessee and "intend[ed] to submit a voter registration form by mail before October 5 and request for an absentee ballot before October 27." DE 93, Harrington Dec., Page ID 2714–15. At the time, however, Brown was in the custody of Davidson County, Tennessee, and was being held without bail until her court date set for November 16, 2020. *Id.* at Page 2715. Thus, Brown would be incarcerated for the November 2020 election period. Plaintiffs did not mention Brown in their appellee brief before this court, perhaps because Harrington's declaration does not explain how Brown would qualify to vote absentee under Tenn. Code Ann. § 2-6-201. Accordingly, plaintiffs cannot rely on Brown to demonstrate an actual legal interest.

notice in August 2001. *Id.* at 584. LPO did not update the notice after August 2001, so when it submitted its petition in November 2003 it was rejected for including the outdated version of the notice. *Id.* LPO challenged both the Ohio requirement that parties must strictly comply with election laws and the Ohio primary election petition process in general. *Id.* at 584–85. This court found that the second challenge to the petition process was capable of repetition, yet evading review, because even though the 2004 elections had ended, LPO could seek to participate in future Ohio primary elections. *Id.* In contrast, we found that the first challenge to Ohio's strict compliance requirement was moot. *Id.* 584. This court explained that "[o]utside of this unique factual situation" where a requirement changed midway through the petition process, "there [was] not a reasonable expectation or demonstrated probability that the LPO or any other political group will be injured by Ohio's requirement of strict compliance with election laws." *Id.* at 584; *see also Tigrett v. Cooper*, 595 F. App'x 554, 557–58 (6th Cir. 2014) (finding the challenged action was not capable of repetition because it was based on a consolidated election that historically only occurred once every 40 to 50 years).

Similarly, Sweet's alleged injury and the plaintiffs' motion for a preliminary injunction are inextricably tied to the COVID-19 pandemic, a once-in-a-century crisis. In their memorandum in support of their motion for a preliminary injunction before the district court, plaintiffs recognized that "these are not ordinary times." DE 43, Memorandum, Page ID 1681. While plaintiffs claimed that the first-time restriction burdened all first-time voters simply by making it more difficult for them to vote, plaintiffs' central concerns related to the COVID-19 pandemic. For example, plaintiffs argued that "Tennessee simply cannot ensure voters' safety at the polls" and worried about the possible exposure to COVID-19 while waiting in line to vote. *Id.* at Page ID 1682. Sweet also stated that he was "particularly concerned that [he] could contract COVID-19 but be unable to vote absentee because of the first-time voter rule" and that he did not want to vote in person because of the risk of COVID-19. DE 86-2, Sweet Dec. 2, Page ID 2670–71. In its order granting the preliminary injunction, the district court also relied on the unique challenges posed by the COVID-19 pandemic. *Memphis A. Phillip Randolph*, 485 F. Supp.3d at 982–83. Fortunately, because of advancements in COVID-19 vaccinations and treatment since this case began, the COVID-19 pandemic is unlikely to pose a serious threat during the next election cycle. *Trends in Number of COVID-19 Cases and Deaths in the US*

*Reported to CDC, by State/Territory*, Ctrs. for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (June 15, 2021). There is not a reasonable expectation that Sweet, other members of the plaintiff organizations, or the public will face the same burdens as voters did in the fall of 2020. The unique factual situation of this case makes it one of the rare election cases where the challenged action is not capable of repetition.

In sum, plaintiffs have not shown that there is a substantial likelihood that their claim remains justiciable because they no longer have an ongoing legal interest in the outcome of this case. Since plaintiffs have not established a substantial likelihood of success in demonstrating subject matter jurisdiction, they are not entitled to a preliminary injunction. *See Waskul*, 900 F.3d at 256 n.4.

## IV.

In conclusion, plaintiffs have failed to justify the continuing need for the preliminary injunction because plaintiffs have not demonstrated that there is a substantial likelihood that their claim remains justiciable. Accordingly, we vacate the district court's preliminary injunction and remand the case for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

CHAD A. READLER, Circuit Judge, concurring.  With no live controversy between the parties, I agree that the preliminary injunction must be vacated.  And should this dispute resurrect itself in some form, it seemingly would take little work to conclude that Tennessee's "first-time voter law" easily passes constitutional muster.

In essence, the Tennessee law in question requires new Tennessee voters either to register to vote in person or, should they register to vote by mail or online, to vote in person the first time they vote in an election.  *See* Tenn. Code Ann. § 2-2-115(b)(7).  The law's apparent impetus is to employ a safeguard that a new voter confirms her identity in person to Tennessee election officials at least once—either when registering or, alternatively, when voting for the first time.  *See id.*

For matters involving election mechanics, we traditionally have employed the framework articulated in the Supreme Court's *Anderson-Burdick* line of cases.  *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).  For reasons I (and many others) have previously explained, *Anderson-Burdick* does little to constrain a court's decisionmaking process, and instead leaves federal judges to weigh standards entirely crafted by the judges themselves.  *Daunt v. Benson (Daunt I)*, 956 F.3d 396, 424 (6th Cir. 2020) (Readler, J., concurring) ("In sensitive policy-oriented cases, [*Anderson-Burdick*] affords far too much discretion to judges in resolving the dispute before them."); *Daunt v. Benson (Daunt II)*, --- F.3d ---, 2021 WL 2154769, at *17 (6th Cir. May 27, 2021) (Readler, J., concurring) ("*Anderson-Burdick*'s hallmark is standardless standards."); *see, e.g.*, *Graveline v. Benson*, 992 F.3d 524, 553 (6th Cir. 2021) (Griffin, J., dissenting) ("This case illustrates once again why applying *Anderson-Burdick*'s grant of discretion to the federal judiciary can lead to tension with the principles of federalism and separation of powers."); *Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020) (suggesting that it can "take[] some legal gymnastics to quantify the 'burden' that the State's disparate treatment places on [one's] right to vote," particularly when a generally applicable rule treats two groups differently but does not necessarily "burden" either

one); *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (noting that "[t]he distinction between 'severe burdens' and 'lesser' ones is often murky" (quoting *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring))). Unbridled judicial discretion of this kind rarely lends itself to consistent decisionmaking. *Daunt I*, 956 F.3d at 425 (Readler, J., concurring) ("In the name of 'flexibility,' *Anderson-Burdick* risks trading precise rules and predictable outcomes for the imprecision and unpredictability of how the judicial-assignment wheel turns."). And that concern is especially troubling when the case at issue involves voting and elections. Edward B. Foley, *Voting Rules and Constitutional Law*, 81 Geo. Wash. L. Rev. 1836, 1859 (2013) (arguing that a test as "indeterminate" as *Anderson-Burdick* "is arguably no test at all, and thus the federal constitutional law that is supposed to supervise the operation of a state's electoral process has little objectivity or predictability"). After all, our circuit's muscular embrace of *Anderson-Burdick* often means that "the permissibility of [a state's] democratic choices in essence turns on how three ([sometimes] two) unelected judges pick and choose the ways in which a state may structure its government or elections." *Daunt II*, 2021 WL 2154769, at \*20. Tellingly, other circuits have not followed our lead. *See id.* at \*21–\*22 (observing that "we stand alone when compared to our sister circuits" in aggressively "deploying *Anderson-Burdick*").

Nonetheless, were the Tennessee law at issue here to be measured by that framework, the district court, in the first instance, would be required to determine both the extent to which the law burdens the right to vote as well as Tennessee's interests in the regulation, and then to weigh the two against one another. *See Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (per curiam). As the logic of *Anderson-Burdick* goes, if the burden is severe, strict scrutiny applies. *Id.* If, on the other hand, the law "impose[s] 'reasonable nondiscriminatory restrictions'" on voters, rational basis applies and "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). And under our Circuit's precedents, if the burden falls somewhere in between, we weigh that burden against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (internal quotation marks omitted) (quoting *Burdick*, 504 U.S. at 434). *But see Daunt II*, 2021 WL 2154769, at \*22 ("Standing alone from

our sister circuits, we deem 'most' *Anderson-Burdick* cases to 'fall in between' the extremes of laws that impose severe burdens and no burdens at all, thereby subjecting a wide swath of state laws to the supposed 'hard judgment[s]' that the whims of *Anderson-Burdick*'s 'flexible standard' 'demand.'" (alterations in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012))).

Tennessee's interests in effectuating its electoral system plainly are sufficient to justify the registration law given the minimal burden the law imposes on Tennessee voters.  As a starting point, the law is content neutral; its mandate applies regardless of a voter's "particular viewpoint, associational preference, or economic status."  *Daunt I*, 956 F.3d at 407 (quoting *Citizens for Legis. Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)).  The law also does not "unfairly" restrict "the availability of a political opportunity" or ballot access.  *Anderson*, 460 U.S. at 793 (quoting *Clements v. Fashing*, 457 U.S. 957, 964 (1982)).  There is no constitutional right to vote absentee.  *See Mays*, 951 F.3d at 792; *see also Common Cause Ind. v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) ("[A]s long as the state allows voting in person, there is no constitutional right to vote by mail."); *accord Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020).  Nor, to my knowledge, has any court recognized a constitutional right to register to vote by mail.  *Cf.* U.S. Const. art. 1, § 4, cl. 1 (providing State legislatures with authority to regulate the "Times, Places and Manner of holding Elections").  At most, there is a federal statutory requirement that states allow voters to register by mail, *see* 52 U.S.C. § 20505, an obligation that Tennessee has honored, and that by all accounts leaves room for Tennessee to require a voter so registered to vote in person, if the person has not previously voted in the jurisdiction, *see id.* at § 20505(c)(1).  Requiring voters to appear in person at least once—either to register or to cast their first vote—may inconvenience some Tennesseans.  But that burden, in view of the law's general and nondiscriminatory application to Tennessee voters as a whole, is properly characterized as minimal.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring) (explaining that the burden of a nondiscriminatory law is analyzed "categorically" under *Anderson-Burdick*, without consideration of "the peculiar circumstances of individual voters"); *see also id.* at 190 (plurality op.) (explaining that *Burdick* held that a reasonable, nondiscriminatory election law imposed a minimal burden despite preventing "a significant number of voters from participating in Hawaii

elections in a meaningful manner" (internal quotation marks and citation omitted)); *Luft v. Evers*, 963 F.3d 665, 675 (7th Cir. 2020) ("One less-convenient feature does not an unconstitutional system make."); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 631 (6th Cir. 2016) ("[B]roadly applicable and non-discriminatory laws are presumed to pass constitutional muster.").

Plaintiffs respond that requiring someone to vote in person if they fail to register in person denies the voter the benefit of Tennessee's absentee voter laws, infringing upon some aspect of the "right to vote." *See Ohio Democratic Party*, 834 F.3d at 626 ("Though not a delineated right per se, the Supreme Court has readily acknowledged the general right to vote as 'implicit in our constitutional system.'" (citation omitted)). But a Tennessee voter can avoid § 2-2-115(b)(7)'s "in person" voting requirement simply by registering in person. And in-person registration occurs virtually year-round, the lone significant limitation being that registration must occur at least 30 days before an election. *See* Tenn. Code Ann. § 2-2-109. At bottom, then, the law at issue merely imposes the "burden" to register in person—*at any time*, other than 30 days before an election. It is difficult to describe that burden as anything more than minimal. *Cf. Ohio Democratic Party*, 834 F.3d at 628–32 (holding that an Ohio law that decreased the early voting period to 29 days and eliminated same-day registration imposed a minimal burden given the variety of voting opportunities available). Truth be told, it is hard to think of a less burdensome requirement associated with the voting process.

This case, I acknowledge, arose at a difficult period in our nation's history, during the height of the COVID-19 pandemic. But the law in question, it bears emphasizing, has been in existence for decades, *see* 1994 Tenn. Pub. Acts 839 (amending Tennessee Code § 2-2-115(b) to include the first-time voter law), and the pandemic is now subsiding, *see Covid Data Tracker Weekly Review*, Ctrs. for Disease Control & Prevention (June 11, 2021), https://perma.cc/ZS7C-W2MP ("Compared with the highest peak on January 10, 2021 (251,834), the current 7-day average [of daily new cases] decreased 94.4% [(13,997)]."). And even when the law is viewed through the unique lens of 2020, voting laws need not be put aside due to issues not of the State's making. *See Thompson*, 959 F.3d at 810 ("[W]e cannot hold private citizens' decisions to stay home for their own safety against the State."); *see also Common Cause Ind.*, 977 F.3d at

664 ("[D]ifficulties attributable to the virus do not require change in electoral rules—not, at least, as a constitutional matter. That some people are unwilling to vote in person does not make an otherwise-valid system unconstitutional. It is for states to decide what sorts of adjustments would be prudent."). Nor, it happily appears to be the case, was the pandemic a significant hindrance to voting in the Volunteer State. According to the Tennessee Secretary of State, Tennesseans cast more than three million votes in the November election, breaking the State's previous record by more than 427,000 votes. *See Tennessee Breaks Voter Turnout and Participation Records*, Tenn. Sec'y of State (Nov. 4, 2020), https://perma.cc/RCM3-WTJ9 (stating that 3,045,401 Tennesseans cast ballots in the November 3, 2020 election). And a vast majority of the total votes—some 93 percent—were cast in person. *See id*; *Early and Absentee Voters for the November 3, 2020 General Election*, Tenn. Sec'y of State (Oct. 30, 2020), https://perma.cc/R5DF-3UUY (stating that 210,428 Tennesseans cast mail-in absentee ballots in the November 3, 2020 election).

All things considered, a court should have little trouble, in a future case, finding that Tennessee's law operates safely within constitutional parameters.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Haphazardly wielding the law and the facts, today's majority misapplies our mootness jurisprudence and vacates a lawful preliminary injunction.  As to the law, the majority closes its eyes to the myriad election cases that we have held to fall within the rule for controversies that are "capable of repetition, yet evading review," *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005), and rewrites a case that it disagrees with.  In so doing, the majority damages future plaintiffs' ability to vindicate through the judicial process the constitutional right to vote.  As for the facts, the majority compounds its legal error with a dim view of the record, ignoring the evidence suggesting that many Tennessee voters—likely Plaintiffs' own members—will find themselves once again qualified to vote absentee by mail in the next election cycle but barred from doing so by Tennessee Code § 2-2-115(b)(7).  Because I would hold that Plaintiffs have demonstrated a substantial likelihood that their case is justiciable and that their constitutional claim will ultimately succeed, I must dissent.

**I.**

Defendants argue that we should vacate the district court's preliminary injunction of Tennessee Code § 2-2-115(b)(7), which requires first-time, mail-registered voters in Tennessee to vote in person even if they would otherwise qualify to vote absentee by mail, because there is a substantial likelihood that this case is nonjusticiable.  Specifically, Defendants contend that this case is nonjusticiable because (1) Corey DeWayne Sweet was not a member of the Tennessee State Conference of the NAACP ("Tennessee NAACP") at the time that Plaintiffs filed their complaint such that they lacked standing to sue or (2) this case became moot when Sweet lost eligibility to vote absentee by mail.  The majority properly rejects the first of these arguments.  But in adopting Defendants' second argument as its own, the majority defies Supreme Court and Sixth Circuit precedent.  I would hold Plaintiffs' claim to be justiciable and reach the merits.

The judicial power of federal courts extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, a (somewhat nebulous) limitation that gives rise to the justiciability doctrines of standing and mootness, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  Together, these complementary doctrines ensure that the federal courts "only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988).  Standing does so by focusing on the initiation of the lawsuit, asking whether the plaintiff, at the time they filed their complaint, had a "personal stake in the outcome." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)); *see Friends of the Earth*, 528 U.S. at 191–92.  Once the plaintiff has overcome the standing hurdle, mootness doctrine comes into play, ensuring that the plaintiff maintains their personal stake in the outcome throughout the pendency of the case.  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  Thus, mootness has sometimes been referred to as "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)).[1]

That shorthand description of mootness as "standing set in a time frame" can be misleading.  Although standing requires a showing that the plaintiff has suffered an "actual or imminent" injury that is "fairly traceable to the challenged action of the defendant" and is "likely" to be "redressed by a favorable decision," *Friends of the Earth*, 528 U.S. at 180–81, 190, the threshold for mootness is more relaxed:  "a case becomes moot only when subsequent events make it *absolutely* clear that the allegedly wrongful behavior cannot reasonably be expected to recur and 'interim relief or events have *completely* and *irrevocably* eradicated the effects of the alleged violation.'" *Cleveland Branch, N.A.A.C.P*, 263 F.3d at 530–31 (emphases

---

[1]The majority suggests that there is some doubt as to whether a plaintiff must "maintain standing throughout the lawsuit" or whether the standing inquiry is "confined . . . to the moment when the lawsuit was filed." Maj. Op. at 8.  But if standing had to be maintained throughout the pendency of a lawsuit, there would be no need for a mootness doctrine at all.  *See Friends of the Earth*, 528 U.S. at 190–91.  We would simply ask whether events occurring after the complaint was filed negated any of the elements of standing.  Our cases are clear that we assess a plaintiff's standing to sue as of the time that they filed their complaint. *See Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) ("[S]tanding does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed."); *Sumpter v. Wayne County*, 868 F.3d 473, 490 (6th Cir. 2017) (same).  Until that binding precedent is overruled, we must follow it.

added) (quoting *County of Los Angeles* v. *Davis*, 440 U.S. 625, 631 (1979)). In maintaining this doctrinal distinction between standing and mootness, courts minimize the risk of "sunk costs to the judicial system" resulting from mooted cases, *Friends of the Earth*, 528 U.S. at 191–92 & n.5, and ensure the courts' ability to vindicate constitutional rights where the personal stake at issue is too fleeting to last the duration of a lengthy court process, *see Roe v. Wade*, 410 U.S. 113, 125 (1973).

With the above principles in mind, I agree with the majority that Plaintiffs have demonstrated a likelihood of establishing standing at the time that they filed their complaint. *See Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) ("To succeed on the merits, a party must first reach the merits, and to do so it must establish standing."). As the majority explains, it was not clear error for the district court to rule that Sweet was likely a member of the Tennessee NAACP when Plaintiffs filed their operative complaint on June 12, 2020. Because Sweet—a first-time, mail-registered voter who at the time qualified to vote absentee by mail under a state-court injunction—was prevented from voting absentee by mail by § 2-2-115(b)(7), he would have standing to challenge the constitutionality of that law in his own right. Accordingly, the Tennessee NAACP likely has associational standing to do so on Sweet's behalf. *See Friends of the Earth*, 528 U.S. at 181 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

I cannot agree, however, with the majority's mootness analysis, which is wholly untethered from our jurisprudence. To reiterate, asking whether a case has become moot is not the same thing as asking whether the plaintiff would have standing if they filed their suit today. *See Friends of the Earth*, 528 U.S. at 190–91; *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 530–31. For example, as relevant here, a case is not moot when the complained-of conduct is "capable of repetition, yet evading review," even if intervening events have rendered the likelihood of the injury recurring too speculative for standing purposes. *Honig*, 484 U.S. at 318 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)); *see Friends of the Earth*, 528 U.S. at 190

("[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."). Under the "capable of repetition, yet evading review" rule, a case is not moot so long as "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Lawrence*, 430 F.3d at 371 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). This is a forgiving standard: a "reasonable expectation" does not require a showing "that a recurrence of the dispute [is] more probable than not." *Honig*, 484 U.S. at 318 n.6. Indeed, "the chain of potential events does not have to be air-tight or even probable to support the court's finding of non-mootness. Instead, it is sufficient that [the plaintiffs] *possibly* could have found [themselves] once again in the same situation [they] faced when [the] suit was filed." *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016).

To illustrate just how forgiving the "capable of repetition, yet evading review" rule can be when properly applied, consider first a case from outside the election context. In *Honig*, the Supreme Court considered a suit brought by two students, John Doe and Jack Smith, under what is now known as the Individuals with Disabilities Education Act ("the Act"), 20 U.S.C. § 1400 *et seq.*, which grants substantive and procedural educational rights to persons with disabilities through the age of 21 by conditioning federal funding upon compliance. *Honig*, 484 U.S. at 308–09. For example, the Act provided the "right to a free appropriate public education," required that covered students not be removed from a "regular classroom setting" unless "education in regular classes . . . cannot be achieved satisfactorily," and included a "stay-put" provision designed to allow a student to remain in their "current educational placement" while challenging proposed changes to the student's placement through a hearing process. *Id.* at 309–12 (alteration in the original) (quoting 20 U.S.C. §§ 1412(1), 1412(5), 1415(e)(5)). The students brought suit against various San Francisco Unified School District ("SFUSD") officials, among others, to challenge the district's failure to adhere to the Act's "stay-put" provision during disciplinary proceedings for "disruptive behavior" related to their disabilities. *Id.* at 312–16. By the time the case reached the Supreme Court, however, seven years had passed and Doe was 24 years old and Smith was 20. *Id.* at 318, 322. Faced with the suggestion

that the case was moot, the Court agreed as to Doe—because the Act's protections apply only through the age of 21 and Doe was 24, his case was not "capable of repetition." *Id.* at 318. The Court reached the opposite conclusion as to 20-year-old Smith, despite the fact that Smith was no longer enrolled at SFUSD or any other California public school and his counsel could not represent that Smith had any intention to reenroll before his eligibility expired. *Id.* at 318–19 & n.6. The Court reasoned that there was still a reasonable expectation that Smith would "again be wronged in a similar way" if he reenrolled, engaged in similarly disruptive behavior, and school officials chose again unilaterally to exclude Smith from his educational setting during disciplinary proceedings. *Id.* at 323 (quoting *Lyons*, 461 U.S. at 111).

The "reasonable expectation" identified as sufficient to overcome a mootness challenge in *Honig* is just as speculative as it sounds. As Justice Scalia argued in a vehement dissent, there was simply no indication that Smith had any intention to reenroll in a California public school—not even Smith's counsel could represent that Smith had any intention to reenroll—beyond the fact that Smith had continued to pursue his lawsuit. *Id.* at 337 (Scalia, J., dissenting). Furthermore, Justice Scalia opined, it seemed "quite unlikely" that, even if Smith reenrolled, his school would choose to place Smith in a similar environment that could not adequately deal with his behavior, given that the Act required schools "to provide an 'appropriate' education in 'the least restrictive environment.'" *Id.* at 338–39 (Scalia, J., dissenting). Add to that the uncertainty that Smith would again face discipline for his behavior or that school officials would exclude him from his educational placement during disciplinary proceedings, and Justice Scalia saw no "demonstrated probability" that the case would recur as to Smith. *Id.* at 336–37 (Scalia, J., dissenting). Yet the majority rejected Justice Scalia's attack, observing that the Court has "found controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable." *Id.* at 318 n.6. The majority explained that the mootness inquiry turns on "whether the controversy was *capable* of repetition and not, as the dissent seem[ed] to insist, whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." *Id.* That was not the case for Doe, who was incapable of availing himself of the benefits of the Act because of his age, *id.* at 318, but was the case for Smith, who could reasonably be expected to reenroll and face similar wrongs under the Act if he did so, *id.* at 318–20 & n.6.

Now consider another illustration from this court, which has acknowledged that the "capable of repetition, yet evading review" rule is even *more* forgiving in the context of election cases. In *Lawrence*, we considered a lawsuit claiming that an Ohio law requiring independent candidates to file a candidacy statement and nominating petition "by 4:00 p.m. on the day before the primary election immediately preceding the general election at which the candidacy is to be voted on by the voters" violated the First and Fourteenth Amendments. 430 F.3d at 370. The plaintiffs were David Lawrence, who sought to run as an independent congressional candidate in the 2004 general election but failed to provide a nominating petition until about three months after the March 1, 2004 deadline had passed, and Yifat Shilo, who wanted to vote for Lawrence. *Id.* By the time the case reached us on appeal, the 2004 election had already taken place, an intervening event that the defendants argued mooted the case. *Id.* We disagreed. Applying the two-prong approach for determining whether a controversy is "capable of repetition, yet evading review," we noted that "[c]hallenges to election laws are one of the quintessential categories of cases which usually fit [the first] prong because litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant election." *Id.* at 371. Turning to the second prong, we acknowledged that the analysis was "more complex because there [was] no evidence in the record addressing whether Lawrence plan[ned] to run for office or Shilo plan[ned] to vote for an independent candidate in a future election." *Id.* We held, however, that there was still a reasonable expectation that the controversy would recur with respect to either plaintiff because Lawrence was still "capable" of running in a future election and Shilo might wish to vote for an independent candidate in the future. *Id.* In the alternative, we held that "[e]ven if the court could not reasonably expect that the controversy would recur with respect to Lawrence or Shilo, the fact that the controversy almost invariably will recur with respect to some future potential candidate or voter in Ohio is sufficient to meet the second prong because it is somewhat relaxed in election cases." *Id.* at 372. In doing so, we recognized that courts usually require a reasonable expectation that the controversy will recur between the same parties but explained that "[c]ourts have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." *Id.* (citing *Rosario v. Rockefeller,* 410 U.S. 752, 756 n.5 (1973); *Dunn v. Blumstein,*

405 U.S. 330, 333 n.2 (1972); *Honig,* 484 U.S. at 335–36 (Scalia, J., dissenting)). Thus, the harm that Lawrence and Shilo suffered was "capable of repetition, yet evading review" because, if the Ohio law remained in place, future candidates and future voters could "suffer the same harm." *Id.*

Returning to the case before us today and with *Honig* and *Lawrence* in mind, I would hold that the there is a substantial likelihood that Plaintiffs' case remains justiciable under the "capable of repetition, yet evading review" rule. The first prong is uncontroversial: the period between elections is too short for a plaintiff to litigate fully a challenge of Tennessee's first-time voter requirement before the next election takes place, at which point they will have irredeemably lost their ability to vote absentee by mail in that election. *See Lawrence*, 430 F.3d at 371. The second prong is apparently more controversial, though it should not be. The majority holds that there is a substantial likelihood that this case is moot because Sweet is no longer eligible to vote absentee and there is no reasonable expectation that he will regain that eligibility in the future. Maj. Op. at 9–10. That holding suffers from three fatal flaws. First, *Lawrence* directs us in an election case to look beyond the parties before us and ask whether the harm could reasonably be expected to recur as to future voters. That is a certainty here. Second, even if we ignored *Lawrence*, and limited our inquiry to whether the controversy could reasonably be expected to recur between the "same complaining part[ies]," *Weinstein*, 423 U.S. at 149, the proper focus would be on the Tennessee NAACP, which, unlike Sweet, is a party to this case. Considering the Tennessee NAACP's over 10,000 members and its regular voter registration activities, I have no difficulty concluding that there is a reasonable expectation that this controversy will recur with respect to a Tennessee NAACP member in the future. Third, even if we artificially limited the inquiry to Sweet, there would still be a reasonable expectation that he will regain eligibility to vote absentee by mail but be prevented from doing so under § 2-2-115(b)(7).

The majority's first mistake is the easiest to address. With *Lawrence* in hand, the second prong should have required little more analysis than the first. Under *Lawrence*, whether or not this controversy could reasonably be expected to recur with regard to Sweet is inconsequential because Plaintiffs' asserted injury is "capable of repetition, yet evading review" as to future

voters.  430 F.3d at 372.  If Tennessee's first-time voter requirement remains in place, it is a certainty that future voters who would otherwise qualify to vote absentee by mail will be forced to vote in person instead (if at all), which is the very injury that the majority holds to be sufficiently cognizable to demonstrate a likelihood of establishing standing as to Sweet and the Tennessee NAACP.  Thus, Defendants' argument that this case is not "capable of repetition, yet evading review" fails because it ignores the reasonable expectation—indeed, the certainty—that first-time voters who would otherwise qualify to vote absentee in future Tennessee elections will "suffer the same harm," *id.*, that gave the Tennessee NAACP standing through Sweet.  The majority all but ignores *Lawrence*, which cannot be reconciled with today's holding.

Turning to the majority's second error, I will, for the sake of argument only, pretend that this is not an election case, and that the controversy must reasonably be expected to recur as to the "same complaining part[ies]."  *Weinstein*, 423 U.S. at 149.  To begin with an obvious, but necessary point, it is the Tennessee NAACP that is a party to this case, *not* Sweet.  To be sure, it is Sweet's interests that served as the predicate for establishing the Tennessee NAACP's associational standing, but our caselaw rejects the proposition that an organizational plaintiff's case is necessarily moot when a member who serves as a basis for the organization's associational standing would lose their personal stake in the outcome of the case.

To accomplish its sleight of hand—analyzing the justiciability of Sweet's hypothetical claim, not the Tennessee NAACP's real one—the majority rewrites the case that has already rejected its foundational premise.  In *Cleveland Branch, N.A.A.C.P.*, we considered a suit brought by the Cleveland Branch of the NAACP ("Cleveland NAACP") challenging the City of Parma's discriminatory hiring practices.  263 F.3d at 516–17.  We held that the organizational plaintiff had associational standing to sue on behalf of Artis Tomblin, who was a member of the Cleveland NAACP when it filed its complaint and wanted to pursue employment with the city as a police officer or fireman but had not learned of various employment opportunities due to the city's hiring practices.  *Id.* at 526.  But by the time that the case reached this court, Tomblin was no longer a member of the Cleveland NAACP and no longer expressed "a present concrete interest in obtaining employment in Parma."  *Id.* at 523, 529.  We nevertheless held that the case was not moot, pointing out that the challenged practices remained in place and could

reasonably be expected to recur with regard to future applicants, without regard to whether Tomblin was among them. *Id.* at 530–32. Our approach prompted a fervent dissent by Judge Boggs, who insisted—as the majority does here—that the Cleveland NAACP's actual case became moot when Tomblin's hypothetical one would have. *Id.* at 539–41. Today, however, under the majority's revisionist history, Judge Boggs's dissent is erroneously believed to be the controlling opinion from *Cleveland Branch, N.A.A.C.P.*, not the majority opinion. A dissent does not become law by fiat of a new majority.

Read faithfully, *Cleveland Branch, N.A.A.C.P.* establishes that even where a complaining party must show that a controversy could reasonably be expected to recur as to itself in order to establish that its case is justiciable, an organizational plaintiff can do so without reference to an individual member who served as the basis for its associational standing. That reading is harmonious with our broader mootness precedent, under which we ask whether the Tennessee NAACP "*possibly* could have found [itself] once again in the same situation [it] faced when this suit was filed." *Barry*, 834 F.3d at 716. There is simply no doubt that it is possible—that there is a "reasonable expectation," *Honig*, 484 U.S. at 319–20 (quoting *Murphy*, 455 U.S. at 482)—that the Tennessee NAACP will find itself with members who are prevented from voting absentee by mail by § 2-2-115(b)(7). The Tennessee NAACP has over 10,000 members across the state and "[v]oter engagement has been a key aspect of [the] Tennessee NAACP's work since its founding." R. 78-1 (Sweet-Love Decl. at ¶¶ 10, 17) (Page ID #2522). Among the organization's voter engagement activities are voter-registration drives at colleges and high schools, and Gloria Sweet-Love, the president of the Tennessee NAACP, submitted a declaration stating that "[m]any young people that [the] Tennessee NAACP registers are college students or future college students that would be eligible to vote absentee under Tennessee's Eligibility Criteria, even before the recent Chancery Court ruling permitting essentially all Tennessee voters to request to vote by mail." *Id.* at ¶ 20 (Page ID #2523); *see* Tenn. Code Ann. § 2-6-201(1)–(2) (allowing Tennessee voters to vote absentee by mail if they will be outside the county where they are registered during the voting period or if they are students enrolled in-state but outside of their county of registration). It takes no great leap of inference to conclude that some of those students who register to vote for the first time through a Tennessee NAACP registration drive will themselves be a Tennessee NAACP member, and

thus will be in the same position that Sweet was in at the time that Plaintiffs filed their amended complaint on June 12, 2020. Thus, the controversy is "capable of repetition, yet evading review."

Turning, finally, to the third error in the majority's mootness analysis, I will indulge for the moment the majority's demonstrably false premise that the likelihood of this case remaining justiciable depends entirely on whether Sweet's hypothetical case—and only Sweet's hypothetical case—would itself be moot. Even accepting that premise, I would dissent, because Defendants have failed to convince me that Sweet's own case would be moot.

The majority concludes that Sweet's own case would have become moot once he no longer qualified to vote absentee by mail, which occurred on August 5, 2020, when the Tennessee Supreme Court vacated a temporary injunction in effect when Plaintiffs filed their amended complaint, which had allowed any Tennessee voter to vote absentee by mail if they determined that it was "impossible or unreasonable" to vote in person because of COVID-19. *Fisher v. Hargett*, 604 S.W.3d 381, 385 (Tenn. 2020). Although I agree that Sweet no longer presently qualified to vote absentee by mail after that ruling, with or without § 2-2-115(b)(7), I would nevertheless conclude that there is a reasonable expectation that Sweet would again in the future be harmed by the rule, such that his case would fall within the "capable of repetition, yet evading review" rule. First, there is no indication that Sweet voted in the November 3, 2020 General Election, and thus we must assume that he still qualifies as a first-time voter, especially since he elected not to vote in the August 2020 primary election due to concerns over COVID-19. R. 86-2 (Sweet Decl. II at ¶ 6) (Page ID #2670). Although Plaintiffs' counsel was unable to represent at oral argument whether Sweet voted in November (which would mean he was no longer a first-time voter subject to § 2-2-115(b)(7)), that does not prevent this case from remaining justiciable any more than in *Honig*, where the case remained justiciable despite counsel for Smith's inability to represent whether Smith wished to reenroll. *See* 484 U.S. at 318 n.6. Next, it is entirely possible that Sweet will regain his eligibility to vote absentee by mail. For example, he may choose to return to school at Xavier University in Louisiana, in which case he would likely qualify to vote absentee by mail in future elections under Tennessee Code § 2-6-201(1), which allows those who will be away from the county where they are

registered during the voting period to vote absentee by mail. Sweet could also qualify to vote absentee by mail if he were travelling, *id.*, sick, *id.* § 2-6-201(5)(C), or serving on a jury, *id.* § 2-6-201(4). The majority derides these possibilities as "speculation," Maj. Op. at 10, but in *Friends of the Earth*, the Supreme Court explained that the possibility that a harm will recur "may be too speculative to support standing, but not too speculative to overcome mootness." 528 U.S. at 190. I think this such a case. At the very least, Sweet's previous enrollment at Xavier University separates him from "a general Tennessee voter," Maj. Op. at 10, and supports a reasonable expectation that Sweet will qualify to vote absentee by mail in the future. Sweet spent his freshman and sophomore years at Xavier University and it is reasonable to expect that he would wish to return if and when classes went back to in person. *See* R. 86-2 (Sweet Decl. II at ¶¶ 2–3) (Page ID #2669). Even if it is not *probable* that Sweet will take that path, it is reasonable to expect that he will (or that he will otherwise regain eligibility to vote absentee by mail), and thus it is reasonable to expect that Sweet will find himself in the same position that he found himself in at the beginning of the case: qualified to vote absentee by mail, but unable to do so because of § 2-2-115(b)(7).

The balance of the majority opinion relies on the proposition that this case is not "capable of repetition, yet evading review" because it is based on a "unique factual situation," i.e., COVID-19. Maj. Op. at 11–13. Because COVID-19 is a "once-in-a-century crisis," *id.* at 12, the majority explains, we need not worry that we will face a similar case again. Indeed, according to the majority "because of advancements in COVID-19 vaccinations and treatment since this case began, the COVID-19 pandemic is unlikely to pose a serious threat during the next election cycle. There is not a reasonable expectation that Sweet, other members of the plaintiff organizations, or the public will face the same burdens as voters did in the fall of 2020." *Id.* at 12–13 (citation omitted). I do not share the majority's willingness to declare a premature end to the COVID-19 pandemic, let alone to turn that into a reason to hold that this case is likely nonjusticiable, especially when not even Defendants have argued that as a basis for vacating the district court's preliminary injunction.

To be sure, recent advancements in COVID-19 vaccinations and treatment are worthy of celebration, and there is good reason to be optimistic that better days are ahead of us given the

significant decline in case numbers across the country.  But it is one thing to be optimistic that we will be free of COVID-19 before the next election cycle, and it is quite another thing to turn that hope into a fundamental premise upon which to vacate a lawfully entered preliminary injunction.  As Dr. Rochelle P. Walensky, Director of the Centers for Disease Control and Prevention, testified before the Senate Committee on Health, Education, Labor & Pensions just last month:

> While COVID-19 cases have recently decreased, COVID-19 transmission remains widespread across the nation.  We are hopeful. We have made significant progress in getting shots in arms.  But, given that many people around the country are not yet fully vaccinated and given the threat of variants, we must remain cautious.

*An Update from Federal Officials on Efforts to Combat COVID-19: Hearing Before the S. Comm. on Health, Education, Labor & Pensions*, 117th Cong., at 2 (May 11, 2021) (written testimony of Dr. Rochelle P. Walensky) (available at https://www.help.senate.gov/imo/media/doc/Walensky1.pdf).  Things are looking brighter, but we are not out of the COVID-19 woods just yet.

The bottom line is that Article III judges should not be in the business of declaring an end to the COVID-19 pandemic: we "do not have the background, competence, and expertise to assess public health." *Bill & Ted's Riviera, Inc. v. Cuomo*, 494 F. Supp. 3d 238, 248 (N.D.N.Y. 2020).  Words cloaked in our robes carry real weight, and I am loath to minimize a disease that has killed about 600,000 Americans and over 3,800,000 persons worldwide. *See United States COVID-19 Cases and Deaths by State*, Ctrs. for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days; *WHO Coronavirus (COVID-19) Dashboard*, World Health Org., https://covid19.who.int/.  I hope that the majority is right, and that COVID-19 will be a distant memory by the next election cycle.  Certainly, our recent progress against the disease is a testament to American ingenuity and scientific achievement.  But the thing about a "once-in-a-century crisis," Maj. Op. at 12, is that it is hard to know how it will develop over the coming months and years, particularly when COVID-19 has defied expectations to this point and with new variants and seasonal surges threatening to undo hard-won progress.  At the very least, COVID-19 is "capable" of continuing to burden

this country through the next general election, and thus it is reasonable to expect that Sweet and voters like him will find themselves in a similar position to the one that they found themselves in on November 2, 2020.  *See Honig*, 484 U.S. at 318–20 & n.6.  Even if that possibility is improbable, it is enough to make this case "capable of repetition, yet evading review." *Id.*  At least until we are certain that COVID-19 will not be a significant threat during the next election cycle, the majority's threadbare proclamations are not enough to moot this case.

In sum, there is a substantial likelihood that this case was and remains justiciable. Accordingly, I think it likely that we would reach the merits, to which I turn now.

## II.

Plaintiffs' constitutional claim is straightforward:  Tennessee Code § 2-2-115(b)(7) burdens their members' fundamental right to vote in violation of the First and Fourteenth Amendments.  The parties agree that Plaintiffs' claim should be reviewed under the balancing test set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under the *Anderson-Burdick* standard, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434.  At one extreme, where "States impose severe restrictions on the right to vote, such as poll taxes or limiting access to the ballot, strict scrutiny applies." *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020).  At the other extreme, where a state "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendments rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).  If a case falls somewhere between these two extremes—because the burden on the right to vote is moderate—"the *Anderson-Burdick* framework departs from the traditional tiers of scrutiny and creates its own test." *Mays*, 951 F.3d at 784.  In such cases, the court must weigh

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). "Only where the State's interests outweigh the burden on the plaintiff's right to vote do voting restrictions not offend the [First Amendment]." *Mays*, 951 F.3d at 784.

The district court held that Plaintiffs are likely to succeed on the merits because § 2-2-115(b)(7) is likely a moderate burden on the right to vote, and that burden outweighs the state's asserted interests. Defendants challenge that ruling at both steps. First, Defendants argue that the district court erred in concluding that § 2-2-115(b)(7) places a moderate burden on the right to vote, triggering heightened scrutiny. Instead, Defendants argue that the statute places only a minimal burden on the right to vote, because it does not prohibit Tennessee voters from voting in person, either early or on election day, such that rational basis review should apply. Second, Defendants argue that even if heightened scrutiny is applicable, the district court erred in its balancing of the burden § 2-2-115(b)(7) places on the right to vote against the state's asserted interests.

The first of Defendant's arguments is effectively foreclosed by this court's precedent. As Defendants recognize, this court "must evaluate the burden on disparately treated voters considering all available opportunities to vote." *Mays*, 951 F.3d at 785. Thus, in *Obama for America v. Husted*, we affirmed an injunction that enjoined the enforcement of an Ohio law that prevented some voters from casting early (in-person) ballots during the three days before the election. 697 F.3d 423, 425 (6th Cir. 2012). Despite the fact that voters who could not cast an early ballot during those three days were free to vote early and in person before that time or on election day, the court concluded that the burden was moderate because the plaintiffs "did not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternate means of access to the ballot.'" *Id.* at 431 (quoting *Citizens for Legislative Choice v. Miller,* 144 F.3d 916, 921 (6th Cir. 1998)). The same reasoning applies here. Many if not most Tennessee voters qualify to vote absentee by mail because they cannot vote in person, or would have great difficulty doing so. *See generally* Tenn. Code Ann. § 2-6-201. For those voters, the burden caused by § 2-2-115(b)(7) is severe if it will be their first time voting, because there are "few alternate means of access to the ballot" aside from voting absentee by mail. *Obama for America*, 697 F.3d at 431 (quoting *Miller*, 144 F.3d at 921). Nevertheless, the

burden is reduced for other voters, who will be merely inconvenienced by the rule—for example, if they qualify to vote absentee by mail only because they are over 60, Tenn. Code Ann. § 2-6-201(5)(A)—suggesting that strict scrutiny is inappropriate. Thus, this case—like most cases—involves a moderate burden that triggers the flexible standard from *Anderson-Burdick*. *See Obama for Am.*, 697 F.3d at 429.[2]

Because the burden here is moderate, we must weigh the burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). On appeal, Defendants identify two such interests: (1) combatting voter fraud and (2) complying with the Help America Vote Act.

As to the first of these justifications, there is a legitimate question as to whether preventing voter fraud was a "precise interest[] put forward by the State as justification[] for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Indeed, the district court specifically remarked on the fact that Defendants did not put the voter-fraud justification forward below. *Memphis A. Phillip Randolph Inst. v. Hargett*, 485 F. Supp. 3d 959, 998–99 (M.D. Tenn. 2020). Although Defendants generally alluded to the fact that mail voting limits their ability to confirm a voter's identify, which in turn makes it more difficult to prevent voter fraud—the eerie spectre of "ghost voting," as Defendants term it—this was not in the context of their arguments regarding the justifications for § 2-2-115(b)(7). *See* R. 46-1 (Goins Decl. at ¶ 11) (Page ID #1827). To the contrary, Defendants argued below that "the provisions of . . . § 2-2-115(7) [sic] do *nothing more* than implement Congress's intent as reflected in both the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20505(c) and Section 303(b) of the [HAVA] (codified at 52 U.S.C. § 21083)." R. 46 (Opposition at 23)

---

[2]Defendants' argument relies on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 809 (1969), for the proposition that rational basis review must apply because there is no constitutional right to vote absentee. However, as Plaintiffs note, that case came before the Supreme Court established the *Anderson-Burdick* framework and has separately been undercut by cases declining to follow it. *See, e.g.*, *O'Brien v. Skinner*, 414 U.S. 524, 528–29 (1974); *Am. Party of Texas v. White*, 415 U.S. 767, 795 (1974).

(Page ID #1787) (emphasis added).[3] If, in fact, that is the "only" justification for § 2-2-115(b)(7), it follows that voter fraud is *not* a justification for § 2-2-115(b)(7). These days, the magic words "voter fraud" can get a state a long way in voting rights litigation—but magic words work only if they are invoked, and Defendants seem to have failed to invoke "voter fraud" below.

In any case, even assuming (without deciding) that Defendants articulated voter fraud as a justification for § 2-2-115(b)(7), that interest would fail to warrant the burden it imposes given the alternatives available to Tennessee (which it has since implemented). To the extent that § 2-2-115(b)(7) combats voter fraud, it does so by granting Tennessee an opportunity, at least the first time a voter votes in an election, to confirm that their voter registration matches their identification. *See generally* R. 46-1 (Goins Decl.) (Page ID #1823–35). But Defendants have failed to explain why other available options—which would allow a first time voter to vote absentee by mail—would be any less effective. *See Memphis A. Phillip Randolph Inst.*, 485 F. Supp. 3d at 999 n.37 (noting that even if Defendants had raised voter fraud as a justification, "they would have encountered difficulties at [the next step] of the *Anderson-Burdick* analysis, because they have not explained how requiring first-time, mail-registered voters to submit the required identification in person when voting helps prevent fraudulent voting to any greater extent than requiring the submission of such identification with mailed-in ballots."). For example, after the district court issued its preliminary injunction, Tennessee implemented a new policy, requiring that at least some first-time absentee voters mail in proof of identification along with their ballots.[4] This approach satisfies Tennessee's interest in confirming a match between the registration information and the voter's identification, while allowing even first-time voters to vote absentee by mail if they qualify to do so. Even if having the voter come in person to present their identification might be more effective—say, because it would be possible to compare a driver's license photo to the voter presenting it—the difference would be marginal, and insufficient to outweigh the potentially severe burden that § 2-2-115(b)(7) imposes on first time voters.

---

[3]On appeal, Defendants no longer insist that the statute is necessary to comply with the NVRA.

[4]*Information for First-Time Voters Who Registered by Mail*, Tenn. Sec'y of State, https://sos.tn.gov/products/elections/information-first-time-voters-who-registered-mail (last accessed May 7, 2021).

As for Defendant's second justification—that § 2-2-115(b)(7) is necessary to comply with HAVA—they at least presented that argument to the district court. The argument, however, is meritless because HAVA does not require first-time voters who registered to vote by mail to vote in person the first time that they vote. *See* 52 U.S.C. § 21083(b) (allowing first time voters to vote by mail if they submit identification with their mail ballot, exempting voters who registered by mail but submitted a copy of their registration with that identification).

Thus, Tennessee Code § 2-2-115(b)(7) is likely unconstitutional under *Anderson-Burdick* because Defendants' justifications for the rule fail to outweigh the burdens it imposes. Accordingly, because Plaintiffs' constitutional claim is likely justiciable, the district court correctly concluded that Plaintiffs are likely to succeed on the merits.

## III.

That leaves the remaining preliminary injunction factors. With no election looming, this is an ordinary constitutional case where likelihood of success on the merits is determinative. *See Online Merchants Guild*, 995 F.3d at 560; *cf. Memphis A. Philip Randolph Inst. v. Hargett*, 977 F.3d 566, 567 (6th Cir. 2020). "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436. And although Tennessee has "a strong interest in [its] ability to enforce state election law requirements, the public has a strong interest in exercising the fundamental political right to vote." *Id.* at 436–37 (internal quotation marks and citation omitted). Insofar as § 2-2-115(b)(7) is likely unconstitutional, the equities and the public interest favor upholding the district court's preliminary injunction.

## IV.

In sum, the district court did not abuse its discretion when it preliminarily enjoined the enforcement of § 2-2-115(b)(7). There is a substantial likelihood that this case remains justiciable, there is a substantial likelihood that Plaintiffs will prevail on the merits, and, accordingly, the equities favor preliminary relief. Thus, I dissent.